WOLFSEN LAND & CATTLE COMPANY, PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9967–74.     Filed April 2, 1979.

*Reed E. Hundt and McGee Grigsby,* for the petitioner.
*Gordon W. Cook,* for the respondent.

STERRETT, *Judge:* By notice of deficiency dated October 4, 1974, respondent determined deficiencies in petitioner's Federal income taxes for its taxable years ended July 31, 1971 and 1972, in the respective amounts of $421.79 and $350,618.18. The major item involved in the deficiencies was the disallowance by respondent of a claimed deduction for prepaid cattlefeed expenses for petitioner's taxable year ended July 31, 1972. Petitioner's petition to this Court was filed December 24, 1974. That petition conceded all respondent's adjustments except for

1

the prepaid cattlefeed adjustment. The claimed deduction for cattlefeed totaled $729,704.53.

On May 21, 1976, petitioner lodged with the Court a motion to amend petition and an amended petition. The motion was granted without objection on May 27, 1976, and the amended petition filed that same date. Petitioner thereby amended its petition to allege that it had incurred a net operating loss of $596,124 in its fiscal year ended July 31, 1974, which, if carried back to its fiscal years ended July 31, 1971 and 1972, would wipe out any deficiencies that could be determined for those years even if the cattlefeed deduction should be disallowed in full. Respondent filed his answer to amended petition on July 26, 1976, in which he denied the existence of a net operating loss for petitioner for its fiscal year 1974.

On January 31, 1978, the parties jointly filed a document entitled "Partial Stipulation" in which they agreed that petitioner's prepaid cattlefeed expense was not allowable for petitioner's fiscal year 1972, the year in which claimed, but was allowable in full for petitioner's taxable year ended in 1973 as an ordinary and necessary business expense. This left only the existence and amount of the net operating loss carryback, if any, allocable to the taxable years before the Court as an issue for our resolution.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the "partial stipulation" of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

Petitioner Wolfsen Land & Cattle Co. is and was at all times relevant hereto a California corporation. At the time it filed its petition herein, petitioner's principal place of business was Los Banos, Calif. Petitioner accounts for its income on a cash basis and, as mentioned above, utilizes a fiscal year ending July 31 as its tax accounting period. Timely Federal corporate income tax returns were filed by petitioner for its taxable years ended July 31, 1971, 1972, 1973, and 1974 with the Internal Revenue Service Center, Fresno, Calif.

The amount of net operating loss originally determined by petitioner for its taxable year ended July 31, 1974, was $596,124. This operating loss was in part attributable to certain depreciation deductions taken by a partnership, Wolfsen M.C. Ranch

(partnership), in which petitioner is a limited partner, for the depreciation of the earthwork components of an extensive irrigation system on the partnership's ranch, the M.C. Ranch (hereinafter M.C. or ranch). Prior to the trial herein, the parties reached agreement with respect to the allowability of all the deductions constituting the net operating loss except for these depreciation deductions. It is, thus, the propriety of these deductions and, if the deductions are proper, the correct basis for depreciation and the period over which the system must be depreciated, that is at issue in this case.

The partnership was formed on February 1, 1972, pursuant to title 2, chapter 2, of the California Corporations Code, for the purpose of purchasing the ranch. It utilizes a fiscal year ending October 31 as its taxable year and reports its income on the cash basis of accounting. The partnership purchased the ranch for $5,050,000 on November 1, 1972, at a mortgage foreclosure sale.[1] On its return for its taxable year ended October 31, 1973, the partnership allocated $943,389.63 of its purchase cost for the ranch to the depreciable items in the ranch's irrigation system, including that system's earthen components. The partnership added $65,439.29 to its "irrigation system" depreciation reserve account for its fiscal year ended October 31, 1973, thus entitling petitioner to a deduction of $11,779.07, its distributive share, on its return for its fiscal year ended July 31, 1974.

The names of the partners, their legal status as partners (general or limited), and their percentage ownership of the partnership's capital are set forth below:

WOLFSEN M.C. RANCH
A LIMITED PARTNERSHIP

| Item | Name of partner | GP/LP | Percentage ownership |
|------|-----------------|-------|----------------------|
| 1 | Wolfsen Feed Lot, Inc ........... GP | | 20 |
| 2 | Wolfsen Land & Cattle Co. (petitioner) ........................ LP | | 18 |

---

[1]Prior to the scheduled foreclosure sale, the partnership had purchased or refinanced all the creditor's interests in the ranch at a total cost of $4,070,000. In addition, in order to complete the sale, the partnership paid $289,322.34 in sheriff's fees, etc., including $100,000 to the previous owner in consideration of his right of redemption. The partnership's total actual out-of-pocket cost for the ranch was, therefore, $4,359,322.34. The partnership paid the difference between the $5,050,000 purchase price and its actual cost to itself.

| 3 | Henry B. Wolfsen | LP | 12 |
|---|---|---|---|
| 4 | Myrna Wolfsen | LP | 10 |
| 5 | Henry A. Wolfsen | LP | 8 |
| 6 | Warren L. Wolfsen | LP | 8 |
| 7 | Lawrence J. Wolfsen | LP | 10 |
| 8 | Donald C. Skinner | LP | 8 |
| 9 | Robert H. Mueller | LP | 4 |
| 10 | Lone Willow Land Co., Inc | LP | 2 |
| | Total | | 100 |

Each of the partners listed above is a member of the Wolfsen family, either by blood or marriage, or is a business entity owned by the Wolfsen family.

The ranch is an operating cattle ranch located in Lake and Harney Counties, Oreg. It is primarily a calf-cow operation and has its own feedlot. The feedlot has a capacity of 8,000 calves per year. The Wolfsens bought the ranch to complement the family's other operations and to help complete the vertical integration of the family's cattle production business.

Lake and Harney Counties are located in the high desert area of southeastern Oregon. Most of the ranch's acreage lies in the Warner Valley which borders the Warner Mountains on the east. These mountains reach heights of up to 10,000 feet. To the east of the Warner Valley is the high desert country where the ranch's cattle summer on range lands leased from the Bureau of Land Management (BLM) and State of Oregon.

The total ranch contains approximately 28,088.38 acres of land owned in "fee." Approximately 22,520.49 of these acres are held in a solid block of acreage which we shall here refer to as the "base ranch." The base ranch is located, for the most part, on the floor of the Warner Valley. Of the 22,520.49 acres in the base ranch, approximately 17,116.3 acres are productive, irrigated land. Outside the base ranch are approximately 5,567.89 acres of fee-owned land scattered in parcels of from 40 to 600 acres in size. That part of the ranch's acreage, which is not under irrigation, is range land, contains buildings, or is "waste" land. Appurtenant, and to some extent contiguous to the fee-owned land, are approximately 38,000 acres of land leased from the BLM and State of Oregon. The BLM and State-owned lands are connected with the base ranch by a drift area or "driveway." Thus, there is no need to truck the ranch's cattle to and from the

leased land. The leased lands to the east of the valley are used as a summer range. The beef winter on the base ranch (for approximately 5 months of the year) and are then driven out onto these leased lands to summer. In the fall, the process is reversed and the cattle are driven off the leased lands and back onto the base ranch. At that time, part of the herd is also put onto approximately 10,087.94 acres of State-leased land on the north end of the valley. The rest of the herd is run on barley stubble and field aftermath for the winter. The grain produced on the irrigated lands is used in the feedlot. Calves are weaned in the fall and are then either put into the feedlot for fattening, or are shipped to the Wolfsen-owned grass lands in California (or another Wolfsen-owned feedlot). The number of cattle allowed on BLM lands, and the dates between which such cattle are allowed to run on BLM lands, are established and limited by the terms of the BLM permit to protect the range from overuse. Cow camps and other ranch-owned structures are interspersed throughout the leased and fee-owned range lands.

The Warner Valley floor was at one time a lakebed. Until the mid–1930's, when the first reclamation project was started and construction of the ranch's present irrigation system (system) began, the land was boggy and water-soaked. The runoff from the snowmelts in the Warner Mountains flowed undiverted onto the valley floor where it stayed trapped in the valley. The soil was a poorly drained muck of silt, silt loams, and peat formed of organic/diatomaceous materials. While the soils of the Warner Valley are generally rich and well suited to the cultivation of such crops as can be grown in the region, i.e., barley, oats, alfalfa, and hay, commercial farming was impossible due to the valley's swampiness. The prerequisites to putting the land under cultivation were to protect it from the flood waters in the spring, to lower the ground water level enough that efficient crop production would be possible, and to irrigate its fields efficiently and effectively. All these functions are performed by the irrigation system whose depreciable quality is here at issue.

Only during the spring runoff is there sufficient water to irrigate the crops. At that time, the water flow may be very high, e.g., Deep Creek can reach a flow of 1,500 cubic feet of water per second at flood time while the Twenty-Mile Creek might reach a flow of 2,000 cubic feet per second. Two large levees, the Twenty-Mile Creek Levee and the Deep Creek Levee,

have been constructed around the floor of the valley to prevent flooding. They direct the spring runoff around the perimeter of the valley and thence into the irrigation system itself. The walls of the levees help form large canals. At various points along the system's canals are valves or turnouts through which water can be diverted from the canals into irrigation ditches on the valley floor. From these ditches the water can be moved to where it is needed and drained from where it is not needed.

The farming operations of the ranch are dependent upon this irrigation system. All the ranch's crops are grown on irrigated land. The system contains approximately 90 miles of manmade earthen ditches, canals, and levees for conveying and containing water. Approximately 95 percent of these ditches are used for both irrigation supply and drainage. The delivery and drainage of adequate amounts of water for the various crops at the appropriate time is vital to successful crop production inasmuch as each crop has its own optimal amount of water and its own needs with respect to the ground water level. The appropriate fields must be soaked and then drained effectively and in a timely manner so that farm equipment can get onto the fields to plant the crops with a minimum wastage of the region's short growing season. The purpose of the irrigation system is, thus, threefold: (1) Protect the valley from the flood waters of Deep and Twenty-Mile Creeks when the snow melts, (2) feed the water out onto the fields in a controlled and orderly fashion, and (3) drain this water and lower the ground water to such a level that efficient crop production is possible.

Most of the irrigation system is composed of earthwork interspersed with "hardware" components such as dams, valves, pumps, etc. The parties have stipulated that the system's hardware components have a useful life of 20 years. The system's earthworks themselves are differently named according to their size and function. A "canal" is a water delivery device. It is a large trench the bottom of which is 5 to 8 feet below ground level and the sides of which are built up well above the surface of the ground and shaped into small levees so as to contain water above ground level. The water can then be directed out onto neighboring fields when desired. Canals are an average width of 20 to 30 feet measured from the top of their bordering levees. A "lateral," also called a "supply" or "head" ditch, is a trench that runs out of a canal and carries water to a

field. A "levee" is a trapezoidally shaped ridge of earth built up and compacted so as to withstand the weight of water pushing against it. The size of any particular levee depends upon the water loads it will need to withstand. A "check" is a small infield levee designed to contain water in one part of a field. On the ranch, since the land slopes downward toward the north, checks are built at the low ends of fields where they act as small earth dams.

A "drain" is a water removal device. Drains are deeper than canals. Their function is to provide a low place into which surface and ground water can flow. The depth of any particular drain depends upon the depth of the ground water level desired for the crops grown in adjacent fields. The ranch, for example, needs a 4- to 5-foot deep ground water level for its alfalfa—thus its drain should be 5 to 8 feet below ground level. An average drain is 5 to 6 feet wide at its bottom and has sides with a 2:1 slope.

On the ranch, since 95 percent of the earthen watermoving structures are used both for water delivery and drainage, the structures should have a 5- to 8-foot depth below ground level, a 5-foot width at their channel bottoms, a wall slope of 2:1, and levees on their borders in order to contain water above field level. These combination structures are referred to herein as "ditches."

The proper maintenance of these various structures is essential to the ranch's efficient operation. It is important that the supply and drainage ditches in the irrigation system be kept clear of sediment and water plants so that water can be quickly and efficiently delivered to and drained from the fields. The main method of ditch maintenance is the use of a machine called a "dragline." A "dragline" is a mobile platform onto which is attached a motor-driven "boom" or arm. On the end of the boom is a "bucket" which is designed to scoop, hold, and then empty itself of dirt. The booms and buckets of these machines vary in length and carrying capacity (the latter being measured in cubic yards).

The main dangers to ditch efficiency include the growth of "tules" (here used generically to refer to all water-loving plants such as cattails, etc.), willow trees, muscrat and field mouse holes and burrows, sedimentation, and wind and water erosion. Another impediment to ditch efficiency is that they are used as

stock watering holes during the months the cattle are wintering on the base ranch, from approximately September through the middle of April.

The effect of the combination of these factors requires that the ditches be worked on with a dragline periodically to prevent dysfunction. Although petitioner performs spot or emergency repairs on the system, it does not have a plan of annual repair and maintenance. Rather, petitioner has adopted a plan whereby it delays repair until a particular stretch of ditch or levee absolutely requires draglining or other work in order to avoid dysfunction. The ranch's combination ditches become dysfunctional (i.e., unable to perform efficiently the tasks for which they were designed) and require cleaning at the end of 10 years. The ranch's large levees and canals can withstand 30 years between maintenance procedures. The ranch's field checks require maintenance to prevent dysfunction every 5 years. Thus, under petitioner's plan, it needs to dragline any one ditch, for example, only once approximately every 10 years. At the end of this time, the hydraulic capacity of the supply and drainage ditches is so reduced that they can neither supply nor drain water efficiently.

The purpose and effect of draglining a ditch is to restore it to its original, or near original, hydraulic capacity. Once a ditch is draglined it is left unattended until such time as it needs to be redraglined or requires emergency repair. It can cost as much to clean a ditch as it cost to build one ab initio, disregarding inflation.

In no case has it been necessary to alter the location or expand upon the original hydraulic capacity of a ditch. All the work performed on the ditches has been to restore their original capacities after a period of neglect. In only one case has it been necessary to fill in and re-dig a supply ditch. Only two levees have needed to be rebuilt after they were washed out by floods.

As mentioned, the ranch is a cow-calf operation. This means that young calves, just weaned from their mothers (weaner calves), are fattened and then sold for meat. The ranch produces approximately 4,000 calves per year out of its 5,000 brood cows. It then uses approximately 700 of these calves as replacement heifers, and puts the approximately 3,300 remaining weaners into the feedlot. There, the weaners are fattened for 120 to 150 days after which time they are sent to the Wolfsen lands in California for further fattening or for slaughter. The calves

enter the feedlot at approximately 325 pounds and are removed when they weigh approximately 650 pounds. A weaner is generally rated at 0.5 AU's.[2] Thus the feedlot can carry approximately 687.5 AU's.[3]

Although the feedlot has a theoretical capacity of 6,000 calves at any one time, its actual carrying capacity is much less. One variable affecting the actual number of calves that can be maintained in the feedlot and the length of time that they can be held there is the amount of grain produced on the ranch or brought in from outside the ranch. It has not been the practice of the partnership to buy outside feed for its calf crop. In years when ranch feed is short, ranch weaners must be moved to California grass earlier and/or sold at less poundage. In years when the ranch has overproduced feed, the excess feed either has been sold or has been used in the feedlot to feed weaners brought in from outside the ranch.

A second variable affecting the ranch's carrying capacity, and hence its productivity, is the use to which it is allowed to put its BLM and State-leased lands. The uses to which the ranch can put BLM land are restricted by the terms of the permits themselves to protect the public lands. These restrictions include limitations on the number of AUM's the ranch can take from the BLM ranges per year, the dates between which M.C. cattle can be on BLM lands, water development rights, fencing limitations, and restrictions to protect the wild horses which roam locally. One of the factors used to determine the number of AUM's available to the ranch per year is the ranch's carrying capacity sans BLM lands. Thus, there is some flexibility in the number of BLM AUM's available to the ranch. Within limits, increased production can be supported and sustained on increased BLM AUM's. Roughly 40 percent of the ranch's carrying capacity is dependent upon Federal range.

The feedlot plant includes calve pens, grain and hay storage facilities, a feed mill, scales, dipping vats, a boilerhouse, and a veterinary building. Other ranch improvements include seven "residences," six tenants' houses, various sheds, cabins, shops,

---

[2]The carrying capacity of any ranch is expressed in terms of animal units (AU's). An animal unit is a mature cow (a 2-year-old steer or range cow weighing 1,000 lbs. or more), horse, or animal of similar size. A yearling may be rated at three-fourths of an animal unit and a calf or weaner at one-half of an animal unit. An animal unit month (AUM) is the number of animal units which can be grazed for 1 month without injurious effect upon the natural vegetative cover of the land.

[3]0.5 AU x 5 mos./12 mos. x 3,300 = 687.5.

storage buildings, bunkhouses, machine sheds, and an airstrip. All the major improvements on the property are being utilized. Some of the smaller sheds and buildings are nonfunctional. The two greatest improvements on the ranch are the feedlot and the irrigation system. The feedlot produced $723,084.34 in income in the fiscal year ended October 31, 1973. This amount was roughly equal to all the other livestock income of the ranch combined, which totaled $736,860.93. Both parties agree that without the irrigation system the base ranch would be a peat bog of zero, or nearly zero, value.

## OPINION

Petitioner claims that it sustained a net operating loss of $596,124 for its taxable year ended July 31, 1974, which it has the right to carry back to its taxable years ended July 31, 1971 and 1972. Part of petitioner's net operating loss for its taxable year ended July 31, 1974, was due to certain deductions taken by the Wolfsen M.C. Ranch, a partnership in which petitioner is a partner, for the partnership's taxable year ended October 31, 1973. Sometime prior to the trial herein, the parties reached agreement with respect to all the items constituting petitioner's 1974 net operating loss except for those items stemming from the partnership's depreciation of its earthenwork irrigation system. The Court has been asked in this case to determine the allowability of the still-contested depreciation deductions.

In arguing whether or not the earthen components of the ranch's irrigation system are depreciable, the parties have raised the issue of the character of certain dragline and related system maintenance expenditures. Petitioner has argued that these activities and expenditures are capital in nature as they are for the reconstruction of parts of the system. Respondent has argued that the activities and expenditures are not capital and implies that they are currently deductible.

The partnership's irrigation system will qualify for a depreciation deduction if it is property described in section 167. That section says in relevant part:

SEC. 167. DEPRECIATION.

(a) GENERAL RULE.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

(1) of property used in the trade or business * * *

The regulations under section 1.167(a)–1, Income Tax Regs., say in material part:

Sec. 1.167(a)–1. (a) *Reasonable allowance.* Section 167(a) provides that a reasonable allowance for the exhaustion, wear and tear, and obsolescence of property used in the trade or business or of property held by the taxpayer for the production of income shall be allowed as a depreciation deduction. The allowance is that amount which should be set aside for the taxable year in accordance with a reasonably consistent plan (not necessarily at a uniform rate), so that the aggregate of the amounts set aside, plus the salvage value, will, at the end of the estimated useful life of the depreciable property, equal the cost or other basis of the property as provided in section 167(g) and section 1.167(g)–1. * * *

(b) *Useful life.* For the purpose of section 167 the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income. This period shall be determined by reference to his experience with similar property taking into account present conditions and probable future developments.

Without question, the irrigation system is a vital, integral part of the economic value of the ranch. Absent the system, the ranch would be a bog of little or no worth; with it, the ranch can grow enough feed to fatten 3,300 weaners a year. The system was designed and, for the most part, built in the 1930's. It has been in continuous operation since its completion.

While it is obvious from the fact that the dragline expenses at issue were incurred that the system was subject to wear and tear, it does not follow that the system was going to expire at some predictable time. In fact, while petitioner indicated that the ranch had not been maintained adequately by its previous owner, it made no effort to describe the condition of the system in terms of its longevity when the ranch was purchased. Furthermore, the evidence affirmatively shows the indeterminability of the system's useful life. The evidence shows that two maintenance policies were open to the partnership. It could institute a program of current repair. Such a program would preserve the system indefinitely. Alternatively, the partnership could decide to dragline periodically when and where necessary to prevent dysfunction. This second policy, the one actually adopted by the partnership, would also preserve the system indefinitely but would preclude the necessity of constant vigilance and maintenance. Both policies have the same effect— the system is preserved and the ranch continued as a viable economic unit. These points are relevant to our conclusion with

respect to the treatment to be accorded to the portions of the purchase price paid in 1972 that are properly allocable to the irrigation system.

We hold that the petitioner has failed to prove that the system or any of its nonhardware components had a definite life viewed from the perspective of the date of purchase. Thus, such items are not entitled to an allowance for depreciation. Sec. 1.167(a)–1(a), Income Tax Regs.

A much more difficult question concerns the treatment of the amounts spent by petitioner to keep the system operable, the so-called dragline expenses. In discussing these expenses we do not presume even to attempt to define as words of art such terms as "rehabilitate," "reconstruct," "clean," and "repair." Even though the parties did try to attribute some definitive meaning to the words, our determination does not depend on resolving the semantic problem.

We have noted that the partnership elected to operate the system according to a plan under which any particular system component was allowed to deteriorate until it was almost dysfunctional, at which time it was draglined. In this way the present system will be maintained at generally its original hydraulic capacity for the foreseeable future. The institution of such a program, as opposed to one of annual maintenance, was its unquestioned right, and we intend no inference herein with respect to this exercise by the partnership of its sound business judgment. Our job is to discern the tax effect of this choice.

The partnership had no intention, and never has had any intention, to alter the ultimate hydraulic capacity of any of the system's canals, laterals, drains, or other ditches. It had no plans to increase, beyond current design limits, the strength of the ranch's levees and checks, or to relocate any canal, lateral, drain, ditch, levee, or check.

Petitioner described in detail at the trial herein how, having once been draglined, the ranch's ditches and levees gradually clog with sediment and tules. When this clogging had gone far enough to affect drastically the ditch's hydraulic capacity, i.e., when it was beginning to have an effect on the productivity of adjacent fields, the partnership cleaned the ditch. It can cost as much to dragline a preexisting ditch as it did to build it originally. Thus, petitioner claims that the partnership should be allowed to depreciate all its ditches on their cost basis over 10

years and then capitalize and depreciate the costs of draglining the ditch to reopen it.

While respondent does not precisely spell out his position, he states his view on brief that "the depreciation issue * * * should be disposed of by the Court's finding * * * that the earthwork at issue, given adequate maintenance, would have an indefinite useful life." Presumably he is taking the uncharacteristic position that the petitioner should deduct currently all expenses incurred to maintain the system.

Thus, we are faced with something of a conundrum, how do we treat a maintenance-type expense substantial in amount, which only restores its subject to its original operating condition, yet need be repeated only on the average of every 10 years and is performed on a subject of indefinite life.[4]

To permit a current deduction of such a large expenditure with a beneficial effect lasting on the average of 10 years would surely distort that years's income. Yet to deny even an amortization deduction for an expenditure with a specific demonstrable beneficial life on the grounds that its deductibility is contaminated by its relationship to an asset of indefinite life, i.e., the land, would similarly require an uneven reporting of income.

Since a basic premise of the income tax laws is to relate expenses to the income which they helped earn, a reasonable solution to our conundrum is to hold that the expenses in issue should be written off over their useful life. In short we would subscribe independent status to those expenditures on the basis that they create a free-standing intangible asset with an amortizable 10-year life.

In reaching this conclusion we turn to sections 162 and 263 for support. Section 162 reads in relevant part:

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *

Section 1.162–4, Income Tax Regs., says:

Sec. 1.162–4. Repairs.
The cost of incidental repairs which neither materially add to the value of

---

[4]We have found that a field check needs maintenance every 5 years, a large levee and canal every 30 years, and general ditches every 10 years. Hereinafter, for simplicity, we shall refer to the estimated useful life only of the repairs made to the system's ditches. The principles we shall discuss apply equally, however, to all the earthen components of the system.

the property nor appreciably prolong its life, but keep it in an ordinarily efficient operating condition, may be deducted as an expense, provided the cost of acquisition or production or the gain or loss basis of the taxpayer's plant equipment, or other property, as the case may be, is not increased by the amount of such expenditures. Repairs in the nature of replacements, to the extent that they arrest deterioration and appreciably prolong the life of the property, shall either be capitalized and depreciated in accordance with section 167 or charged against the depreciation reserve if such an account is kept.

Section 263 says in material part:

SEC. 263. CAPITAL EXPENDITURES.

    (a) GENERAL RULE.—No deduction shall be allowed for—

    (1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate. This paragraph shall not apply to—

    \*      \*      \*      \*      \*      \*      \*

    (C) soil and water conservation expenditures deductible under section 175,

    \*      \*      \*      \*      \*      \*      \*

    (2) Any amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made.

Section 263(a) refers only to expenditures which increase the value of any property or estate and to permanent improvements. The regulations add another category of capital expenditures, i.e., those that "substantially prolong the useful life" of the property or estate or adapt the property to a new use. Sec. 1.263(a)–1(b), Income Tax Regs.

Thus an expense which is "incidental" is currently deductible and is not a capital expenditure. If the repair is an improvement or replacement, or if it increases the property's value or substantially prolongs its useful life, it is capital in nature and is not currently deductible.

The cases have adopted a practical case-by-case approach in applying these principles to the facts before them. The seminal case of *Illinois Merchants Trust Co., Executor v. Commissioner*, 4 B.T.A. 103 (1926), dealt with a petitioner who owned a building part of which was built on wooden pilings over the Chicago River. The water level of the Chicago River suddenly receded exposing the upper end of these wooden pilings to dry rot. Soon, as a result of dry rot, one end of the building began to collapse. To correct the problem, petitioner had to shore up the building, cut the rotten ends of the pilings off below the new water line, and then replace the severed sections with concrete pilings. The

taxpayer expensed the cost of these repairs arguing that they were only "incidental repairs." Respondent argued that the expenditures were capital in nature because they were "repairs in the nature of replacements." *Illinois Merchants Trust Co., Executor v. Commissioner, supra* at 106. In resolving the controversy we said at page 106:

In determining whether an expenditure is a capital one or is chargeable against operating income, it is necessary to bear in mind the purpose for which the expenditure was made. To repair is to restore to a sound state or to mend, while a replacement connotes a substitution. A repair is an expenditure for the purpose of keeping the property in an ordinarily efficient operating condition. It does not add to the value of the property, nor does it appreciably prolong its life.

The Board went on to find that the expenditures at issue "did not add to the value or prolong the expected life of the property over what [it was] before the event which made the repairs necessary" and held for the taxpayer.

In *Mountain Fuel Supply Co. v. United States*, 449 F.2d 816 (10th Cir. 1971), the court dealt with the rehabilitation of gas pipelines. The taxpayer had expensed the costs of "digging up, cutting, removing, hauling, straightening, cleaning, spotwelding the corrosion pits, removal of defective sections, beveling, bending, reopening trenches, rewelding, relaying, testing and burying of all the old pipe returned to service." *Mountain Fuel Supply Co. v. United States, supra* at 818. Approximately 90 percent of the old pipes removed from the ground were reconditioned and replaced in service. The court held that these expenses were capital in nature. In reaching this conclusion the court focused on the fact that reconditioning the pipes increased their capacity to withstand loads of gas, imparted a new useful life to the pipes, and was done pursuant to a plan of rehabilitation "well defined in scope and * * * of considerable significance in view of [taxpayers] overall operations." *Mountain Fuel Supply Co. v. United States, supra* at 821, 822.

In contrast to the court in the *Mountain Fuel Supply Co.* case, the court in *Niagara Mohawk Power Corp. v. United States*, 214 Ct. Cl. 686, 558 F.2d 1379 (1977), dealt with the costs of repairing leaks in pipes. The court there found that the repair expenses did "not increase the value of the cast iron pipelines in comparison with their original leak-free condition," *Niagara Mohawk Power Corp. v. United States*, 214 Ct. Cl. at 699, 558 F.2d at 1387, and

did not increase the pipeline's useful life. Further, the court found that the repairs were not part of a systematic improvement plan.

This Court dealt with similar issues in the case of *Plainfield-Union Water Co. v. Commissioner*, 39 T.C. 333 (1962). In that case, petitioner had cleaned and lined with cement certain lengths of pipe. We found that (39 T.C. at 337):

The repair did not form a part of an overall plan of improvement[,] [t]he cleaning and lining did not materially increase the useful life, value, or structural strength of the pipes involved, nor did it render those pipes suitable for any new or additional use * * *

Not surprisingly, we concluded that the amounts in issue were currently deductible.

The ranch's ditches can be analogized to the pipelines discussed in the *Mountain Fuel Supply Co.* and *Niagara Mohawk Power Corp.* cases. In our case, the system has an indeterminable useful life and is of itself, therefore, nondepreciable. In *Mountain Fuel Supply Co.*, the old pipe had been totally depreciated and had reached the end of its useful life. Both the pipe and the system were subject of great expenditures which were part of a plan of rehabilitation. While in the *Mountain Fuel Supply Co.* case the effects of these expenditures were inseparable from the pipe itself and would be of value only for a period equal to the new useful life of the pipe, in our case the expenditures create a separate amortizable intangible of a useful life much shorter than that of the system. In both cases, the costs must be capitalized.

In *Bayou Verret Land Co. v. Commissioner*, 450 F.2d 850, 857–858 (5th Cir. 1971), the court dealt with road work involving the rebuilding of a levee. Before the work was done, the levee was 50 to 78 percent under water. After its completion, the levee was uniform in height and topped with an all-weather road. The court found that the work done was not "ordinary" in the section 162 sense and had prolonged the levee's useful life. See *Commissioner v. Tellier*, 383 U.S. 687, 689–690 (1966). Petitioner, referring to the partnership's draglining work, said on brief "It is work not of ordinary and frequent character, but rather is extraordinary, done only once over a period of years." We agree. That is the reason these expenses cannot be currently deducted. This does not require, however, that we also hold that a system

already in existence for over 40 years and with no end in sight is depreciable on a 10-year basis.

Thus, the cases in this area have focused on both value and useful life and whether the particular expenditure at issue was made pursuant to a larger plan the purpose and effect of which was to increase the value or extend the useful life of the item involved. Those cases which have held an expense currently deductible have also found that the expense did not substantially increase the repaired item's value or original useful life. See *Pacific Fruit Express Co. v. Commissioner,* 60 T.C. 640, 646 (1973); *Honigman v. Commissioner,* 55 T.C. 1067, 1080 (1971).

Applying the principles of these cases to the peculiar facts before us we consider several points to be important: The subject expenditures are part of a systematic plan under which most of the earthworks on the ranch will be draglined. Thus the dragline expenditures have a significant impact on the value of the system. A cleaned ditch or reworked levee is of more value than is one in need of repair. A more efficient system renders the ranch more productive and valuable. We also believe that, to the extent that the expenditures have the effect of replacing the previously wasted intangible created by the last draglining of the subject ditch or levee, they have a substantial impact on the value of the system, as well as producing a separate item of value. Related to this point is the magnitude of the expenditures themselves. Petitioner indicates that it can cost as much to dragline a ditch as it did to construct one originally. See *Zumwalt v. Commissioner,* 25 B.T.A. 566 (1932).

Secondly, we consider important the fact that the expenditures in issue produce an item of value which is not used up by the end of the taxable year in which made. Indeed, many of these expenditures produce value which is used up only gradually over the course of up to 30 years. Thirdly, these expenditures will affect the ranch's production of income over a course of many years. In the case of, for example, general field ditches, these expenditures will have an effect on the ditch's efficiency and hence on the ranch's production of income for up to 10 years. Finally, we note that the item of value produced wastes over a predeterminable useful life (see n. 4 *supra).* Any particular ditch, levee, or canal is less efficient and more clogged with sediment and tule growth at the end of any year than it was the year before. Each year, part of the value and effect of the last

draglining operation on that part of the system is used up—until at the end of 10 years the whole value has been used up and the ditch again needs to be draglined. In sum, these expenditures are more than merely "incidental." They are, rather, in the nature of capital "replacement" expenditures which must be capitalized and amortized over their appropriate useful lives, i.e., 5 years for field checks, 10 years for ditches, 30 years for large levees and canals.[5] See n. 4 *supra*. See sec. 1.167(a)–3, Income Tax Regs.

Turning now to the matter of the depreciable basis of the irrigation system's hardware, i.e., its valves, pipes, pumps, concrete dams, etc. (for which the parties have stipulated a 20-year useful life), it is necessary to determine the actual fair market value of the ranch and its component parts as of its sale date, November 1, 1972. If the amount actually paid for the ranch and its component parts differs from the ranch's fair market value as of the sale date, then the basis allocation for depreciation purposes must be based on the relative actual fair market value of the ranch and its component parts. Sec. 1.167(a)–5, Income Tax Regs.

Both parties had valuation experts who testified at the hearing held herein. Respondent's expert, Philip G. Rodwell (Rodwell), valued the ranch at $7 million or approximately $2,500,000 more than petitioner actually paid for it. Rodwell allocated most of this increased value to the M.C.'s land—which is, of course, not depreciable. For valuation purposes, Rodwell refused to attribute a value to the irrigation system independent from the land. Rodwell would thus increase the value of the M.C.'s nondepreciable assets in relation to the ranch's depreciable assets. This change in the percentage values of the depreciable and nondepreciable items would effect a reduction in cost basis allowable to the depreciable items in the system: While the

---

[5]Our conclusion that the dragline expenditure in issue must be capitalized and amortized comports with the purpose of sec. 167 as described by the Supreme Court in *Commissioner v. Idaho Power Co.*, 418 U.S. 1, 10–11 (1974):

"Depreciation is an accounting device which recognizes that the physical consumption of a capital asset is a true cost, since the asset is being depleted. * * * The Court stated in *Hertz Corp. v. United States*, '[T]he purpose of depreciation accounting is to allocate the expense of using an asset to the various periods which are benefited by that asset.' [citations omitted.]"

The effect of our decision herein is nothing more or less than to require that the partnership deduct its dragline expenditures only as the value created thereby is actually spent, i.e., we here require only that "the expense of using [the intangible] asset [be allocated] to the various periods which are benefited by the asset."

partnership allocated $943,389.63 of its purchase price to the system including its earthenworks, respondent would give the system hardware a fair market value on date of purchase of $271,000. Since $271,000 is 3.87 percent of $7 million, respondent would give petitioner a cost basis in the system hardware of 3.87 percent of $5,050,000 or $195,000.

Petitioner claims a fair market value as of November 1, 1972, for the ranch of $4,333,000. This valuation claim was presented by petitioner's expert Elmer Kolberg (Kolberg). Kolberg used the so-called "comparable sales" method of valuing the ranch as of November 1, 1972, the date the partnership purchased it. This method does not appear to be inconsistent with the approach taken by respondent's expert.[6] The "comparable sales" method functions by: (1) Locating ranches as physically similar (comparable) as possible to the subject ranch which (2) have been sold on the open market in noncollusive, nonforced sales for cash or cash equivalent, within (3) a reasonable time of the date for which a value of the subject property is desired. Once these ranches are located, those features of the ranch being valued which are most pertinent to its value are compared to those same features on the comparable ranches. Since no two sales and no two ranches can be identical, the value of those features of the comparable ranches which are relevant to the value of the subject ranch are adjusted until they are of a condition or quality equivalent to those of the subject ranch. The effect of these adjustments on the estimated value of the comparable ranches will give the valuator an indication of the value of the subject property on the relevant date. Like most valuation techniques, the comparable sales method is far from an exact science. However, it is based upon the commonsense approach of taking the actual sales prices of properties similar to the subject property and then relating these prices to the subject property. We believe this valuation method to be a reasonable one and will use it here. This Court has used it often in the past. See *Estate of Fawcett v. Commissioner*, 64 T.C. 889, 899 (1975); *Estate of Nail v. Commissioner*, 59 T.C. 187, 193 (1972).

The validity of the comparable sales valuation method depends to a great extent upon the comparables selected and the

---

[6]Respondent's valuation expert did not elucidate his method of valuation. We cannot, therefore, say with certainty what method of valuation he used.

reasonableness of the adjustments made thereto. Of the two valuation reports before us, the one by petitioner's expert Kolberg is the most useful in determining the ranch's November 1, 1972, fair market value. Kolberg began by isolating seven comparable sales one of which was the sale of the ranch itself in 1967. Kolberg attempted to limit his comparables to ranches with carrying capacities of over 3,000 AU's. Kolberg testified that it was his opinion, based upon his experience, that ranches over that size were of a totally different sort than ranches under that size. By thus limiting his comparables, Kolberg hoped to eliminate carrying capacity as a comparable needing adjustment.[7]

Kolberg then listed nine factors or comparables which he considered and adjusted in deriving his total value for the ranch of $4,333,000. These comparables include the ratio of fee-owned to leased land; the ranch's dependency on BLM permits; the ratio of irrigated to range land; the ranch's location (its proximity to highways, schools, hospitals, population centers, etc.); the ranch's recreational possibilities (called by Kolberg "amenities"); its probable efficiency of cattle production (i.e., whether the cattle had to be trucked between ranges, etc.); the ranch's water rights and its efficiency in its use of water; the ranch's physical improvements such as buildings, residences (and presumably feedlots); whether the comparable ranch was forced-sold or not; and finally, the time of the sale (so that factors such as inflation and increasing land values could be factored in).

Each of these factors was compared to its counterpart on the M.C. and either revalued, or devalued, to reflect Kolberg's estimate of the increase or decrease in the sales price of the comparable ranch that would have occurred had the factor been of the quality possessed by the ranch. This refined comparable ranch, and its estimated value, was then compared to the ranch, and a value for the ranch as of the applicable date, November 1, 1972, derived.

It would appear that, in the comparable sales method of valuation, the actual percent adjustment for any one factor is dependent to a great degree upon the appraiser's own profes-

---

[7]We note that one of Kolberg's comparables, Alder Creek Ranch, had a carrying capacity of approximately 2,800 AU's per year.

sional judgment. We are satisfied that Kolberg's selection of comparables was reasonable and that his adjustments thereto were based upon sound judgment and a detailed knowledge of all the properties mentioned in his report.

In contrast to Kolberg's report, respondent's expert was much more conclusory in presenting his opinion. Although he too listed a series of ranches the values of which he felt would substantiate his final estimation of M.C.'s value at $7 million, the Court was not informed of his reasoning in reaching that final price. Further, we note that the reliability of this expert's opinion was severely compromised by several errors in his calculations which surfaced during the trial held herein.

Thus, we accept petitioner's valuation of the ranch—with some adjustments. We do not think that petitioner's expert took sufficient account of the increase in irrigated acres which occurred between 1967 and 1972. These acres should increase crop production north of Highway 140 and, therefore, should create a supply of grains in excess of that available in previous years—a supply which may be used in the ranch's feedlot. We have already noted that feedlot income is approximately equal to general ranch income. While the feedlot may not be appropriately located for commercial use, it fits in well with the Wolfsens' plan for vertical integration of their operations. Given increased crop production, the total carrying capacity for the base ranch may be increased which could cause a reflective increase in the M.C.'s allotment of BLM AUM's. Further, the incidence of importing weaners for fattening on the M.C. could increase.

We settle on a value for the ranch of $5 million.

*Decision will be entered under Rule 155.*

