CARROLL RHEINSTROM AND ESTATE OF IRENE RHEINSTROM, DECEASED; CARROLL RHEINSTROM AND THE BANK OF NEW YORK, EXECUTORS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Rheinstrom v. Commissioner
Docket No. 7853-76.
United States Tax Court
T.C. Memo 1982-101; 1982 Tax Ct. Memo LEXIS 645; 43 T.C.M. (CCH) 668; T.C.M. (RIA) 82101; February 25, 1982. *645 Held: The date-of-contribution fair market values of four parcels of land determined. Sec. 170, I.R.C. 1954. John E. Beerbower, for the petitioners. Joan Ronder Domike, for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Federal individual income tax against petitioners as follows: [1]
Year
Deficiency
1967
$ 9,753.64
1968
20,429.22
1970
30,557.60
1971
32,963.00
1972
38,000.14 Petitioners claim an overpayment for 1967 of not less than $ 319.25, or so much of the tax liability as resulted from the inclusion in petitioners' gross income for 1967 of $ 581 in interest income. After concessions by the parties with respect to other issues, the issue for decision is the fair market values of four parcels of land contributed to an eligible charitable donee. FINDINGS OF FACT Some of the facts have been stipulated; the stipulation and the stipulated exhibits are incorporated herein by this reference. When the petition in this case was filed, petitioners *646 resided in the Town of Copake, New York. Petitioner Carroll Rheinstrom (hereinafter sometimes referred to as "Carroll") and Irene Rheinstrom (hereinafter sometimes referred to as "Irene") were married to each other from 1934 through the years before the Court. Irene died on or about December 6, 1977, and thereafter her estate became a petitioner in the instant case. Over a period of thirty years, Carroll and Irene acquired ownership of many acres of land in the Town of Copake, Columbia County, New York, just south of the boundary of the Town of Hillsdale. Their initial acquisition consisted of an old farm house and 120 acres of land purchased on their wedding day in 1934, which was their principal residence until Irene died in December 1977. Irene and Carroll gradually acquired almost 900 additional acres of land surrounding their initial acquisition. Part of this range of wooded hills became known as Rheinstrom Hill and part was in the northeastern portion of an adjacent area known as Scutt Hill. (The above-described land, of approximately 1,000 acres, is hereinafter sometimes referred to as "the Rheinstrom property".) Irene and Carroll acquired the land surrounding the house *647 and 120 acres for the purpose of subdivision into smaller lots and resale for development. As part of that plan, they acquired several houses along a road leading to the Rheinstrom property, improved them, and resold them. Irene was a successful real estate broker in the Columbia County area surrounding Copake and Hillsdale during the years of her marriage. She also had from time to time, with Carroll's financial help, bought and sold real property in the area on her own account. Irene and Carroll jointly had the experience and resources to subdivide the Rheinstrom property and market it for residential development. In 1967, Irene and Carroll began to explore the possibility of donating the Rheinstrom property to the National Audubon Society (hereinafter referred to as "Audubon") or some similar organization so that this property could be retained in a natural, unspoiled state. During 1967, Irene and Carroll met with John Baker, president emeritus of Audubon, and Erard A. Matthiessen, a director and chairman of Audubon's Committee on Natural Areas. Irene and Carroll were taken to visit Audubon's nature preserve in Sharon, Connecticut, and representatives of Audubon inspected the *648 Rheinstrom property. In 1967, Irene and Carroll concluded that the objectives, policies, and management experience of Audubon were consistent with their aims for the preservation of the Rheinstrom property. The Audubon representatives expressed active interest in, and enthusiasm for, receiving this property to be held as a nature preserve. On October 25, 1968, Audubon executed a written agreement (hereinafter sometimes referred to as "the 1968 agreement") with Irene and Carroll, which provided in part as follows: "Rheinstrom Hill" [the Rheinstrom property] is the name of the estate in Copake Township, New York, which the Rheinstroms [Irene and Carroll] occupy and use as their home and, as used in this Agreement, the term shall mean and include all interests which either of the Rheinstroms shall have in any real property in said Township and in any household furniture and furnishings and equipment located on such real property. It is the present intention of the Rheinstroms that, by means of inter vivos deeds and/or their respective last wills, they will cause Rheinstrom Hill (with the exception of a small parcel to be reserved as a family burial plot) to be owned after the deaths *649 of both of them by the Society [Audubon], and the Society agrees that, if the Rheinstroms shall do so, the Society will accept Rheinstrom Hill and maintain and use it, on the terms and conditions hereinafter set forth. 1. The Society agrees to keep all the land not now under cultivation in a wild state for educational purposes which may include the following: (a) preservation of wild life and plant life under natural conditions; (b) ecological studies by qualified scholars; and (c) viewing by responsible adults and children (particularly children from urban areas) accompanied by such adults. 2. The Rheinstroms agree that, if Rheinstrom Hill shall become the property of the Society, they will cause to be in existence after the deaths of both of them a substantial fund to be held by Chemical Bank New York Trust Company, in trust, as part of The New York Community Trust, to be known as "The Irene and Carroll Rheinstrom Fund." The income from such fund will be used to provide for the maintenance, development and expansion of Rheinstrom Hill and, to the extent that there shall be income available after adequately providing for such maintenance, development and expansion, for the general *650 purposes of the Society. * * * 7. The Rheinstroms and the Society agree that if the Society shall at any time purport voluntarily to transfer all or any substantial part of Rheinstrom Hill or shall fail to maintain and preserve Rheinstrom Hill in accordance with the provisions of this Agreement, (i) all right, title and interest of the Society and its purported transferee in and to Rheinstrom Hill shall terminate and Chemical Bank New York Trust Company, as trustee of the Irene and Carroll Rheinstrom Fund, shall be entitled to take full possession and enjoyment of Rheinstrom Hill and to receive from the Society any and all deeds and/or other confirmatory evidence of title to Rheinstrom Hill, (ii) all distributions to the Society from The Irene and Carroll Rheinstrom Fund shall cease, and (iii) appropriate representatives of The New York Community Trust shall be entitled to take such action (including arrangements with some other organization for the maintenance of Rheinstrom Hill) as they shall deem advisable in order to give effect to the purposes of this Agreement and the conditions to which the Society's title to Rheinstrom Hill shall be subject. During the years before the Court, *651 both Audubon and the New York Community Trust (hereinafter sometimes referred to as "NYCT"), to which the 1968 agreement refers, were eligible charitable donees of the sort described in section 170(b)(1)(A). [2]
On December 23, 1967, Irene and Carroll [3] delivered as a gift a deed (dated December 21, 1967) to a representative of Audubon, for 68.75 acres of unimproved real property (hereinafter sometimes referred to as "Parcel 1") at the north end of the Rheinstrom property. The deed conveyed title in fee simple and did not include any restrictions. On October 11, 1969, by deed of that date, Irene and Carroll conveyed to Audubon, as a gift, title to 68.75 acres of unimproved real property (hereinafter sometimes referred to as "Parcel 2") located adjacent to Parcel 1. The deed contained no restrictions. On December 19, 1969, by deed of that date, Irene and Carroll conveyed to Audubon, as a gift, title to two parcels of unimproved real property adjacent to Parcels 1 and 2. One parcel *652 (hereinafter sometimes referred to as "Parcel 3") consisted of 50 acres; the other parcel (hereinafter sometimes referred to as "Parcel 4") consisted of twenty acres. The deed contained no restrictions. Parcels 1, 2, 3, and 4 are hereinafter sometimes referred to collectively as "the subject properties". Columbia County, in which the subject properties are located, is about half way between Albany and Poughkeepsie; it stretches from the east bank of the Hudson River to the Massachusetts border. The Rheinstrom property is about three miles west of the Massachusetts border, near the southern end of that border. Scutt Hill and Rheinstrom Hill are about two-thirds the height of the Berkshire Mountains, immediately to the east. The subject properties are much less steep than the Berkshire Mountains but much steeper than the valley of the Roeliff Jansen Kill, which lies between the Rheinstrom property and the Berkshire Mountains. The slope of the subject properties generally is more than fifteen percent. A 1971 planning report for the Towns of Ancram, Copake, and Hillsdale states that "those areas containing slopes of over 15% [could be developed, but] are not suitable for intensive *653 development and if used for residential purposes should be at a density at least low enough to preclude the necessity for utilities (sewer and water)." The highest and best use of the subject properties at the times of the donations was for recreation, with the possibility of light residential development at some future time. Before 1971, the Town of Copake had no requirements for the filing of subdivision plats before residential development and no applicable zoning restrictions. The only legal restriction on the residential use of property in 1967 through 1969 was the requirement to obtain the approval of the State Department of Health after the fourth lot was sold from a larger parcel. After 1971, a 50-foot right-of-way was required for new town roads. All of the subject properties are located in the northeast quadrant of Scutt Hill. Underhill Road runs generally north-south past the eastern side of Scutt Hill. Parcel 1 has access to Underhill Road by a twenty-foot-wide right of way. The right of way is about 123.2 feet long. When Irene and Carroll gave Parcel 3 to Audubon, they believed that it included a small triangular piece of land such that it would connect to Underhill *654 Road at its northeast corner and to an old town road that ran west from Underhill Road at that point. When they discovered, in September 1975, that the triangular piece of land had not been transferred to Audubon as part of Parcel 3, they transferred the triangular piece of land to Audubon but made no claim for any charitable deduction therefor. By reason of the donation of Parcel 1 in 1967 and Parcels 2, 3, and 4 in 1969, Carroll and Irene claimed charitable contribution deductions on their 1967 and 1969 income tax returns and carryover charitable contribution deductions on their 1968, 1970, and 1971 income tax returns. The date-of-contribution fair market values of the subject properties, as (1) shown on Carroll's and Irene's income tax returns, (2) testified to by petitioners' expert witness, (3) determined by respondent in the notice of deficiency, (4) testified to by respondent's expert witness, and (5) found by the Court, are set forth in table 1. Table 1 1967--
1969--Aggregate of
Parcel 1
Parcels 2, 3, and 4
(1) Petitioners--tax returns
$ 90,000
$ 240,300
(2) Petitioners--expert witness
62,000
167,000
(3) Respondent--notice of deficiency
14,000
34,500
(4) Respondent--expert witness
5,414
14,525
(5) Found by the Court
35,000
85,000
OPINION *655 Petitioners are authorized to take deductions under section 170(a)(1)[4] for the fair market values of the properties they contributed. Sec. 1.170-1(c)(1), Income Tax Regs. The deductions are allowable up to 30 percent of adjusted gross income, and "excess" amounts may be carried over for deduction in subsequent years. [5] *656 The issues presented for decision are the amounts of the fair market values of the subject properties as of the dates of their contributions. The parties' positions and our holdings are set forth in table 1, supra.
Generally, the fair market value of property is the price at which a willing buyer will purchase from a willing seller, when neither is acting under compulsion and both are fully informed of the relevant facts and circumstances. E.g., McShain v. Commissioner,71 T.C. 998, 1004 (1979). Respondent's determinations in the notice of deficiency as to the fair market values of the subject properties are presumptively correct, and petitioners bear the burden of proving higher values. Welch v. Helvering,290 U.S. 111 (1933); Rule 142, Tax Court Rules of Practice and Procedure.
At trial, both parties presented the testimony of expert witnesses to establish the fair market values of the subject properties. Petitioners' expert witness, George H. Beach (hereinafter sometimes referred to as "Beach"), is a licensed real estate broker and maintains an office in the Town of Austerlitz, New York. He has lived in Columbia County since about 1930 and has owned real property in Columbia County since 1947. He has purchased, *657 sold, and appraised many parcels of rural, unimproved land in the Copake and Hillsdale areas of Columbia County. Beach used the comparable sales method of assigning values to the parcels in question. He examined two groups of sales, viz., one to fourteen acres (three sales) and 15 to 62 acres (seven sales). Beach also referred to 22 options obtained by Boise Cascade Corporation in November of 1969. The option prices equalled or exceeded $ 1,000 per acre and generally were for parcels of 100 acres or more. However, these optioned properties were not sold at the option prices. Based on these sales and on his long, local experience, Beach concluded that Parcels 1, 2, 3, and 4 had fair market values of $ 62,000, $ 75,000, $ 60,000, and $ 32,000, respectively. These values represent approximate per-acre values of $ 900, $ 1,100, $ 1,200, and $ 1,600, respectively. Respondent's expert witness, Leland T. Bookhout (hereinafter sometimes referred to as "Bookhout"), is a real estate appraiser and maintains an office in Hyde Park, New York. He lives in Staatsburg, New York. His area of specialization is generally, the eastern half of New York State, especially the area between Albany *658 and New York, extending up and down both sides of the Hudson River, and southern Vermont. He did some work for the Town of Hillsdale and an appraisal of property at the border of Dutchess and Columbia Counties. In preparing his report, he "probably spent the better part of a week up there, including one or more days that [he] met with" Beach. Bookhout used the comparable sales method of assigning values to the parcels in question. He attempted to value the subject properties as two parcels, one 68.75 acres (Parcel 1) and the other 138.75 acres (Parcels 2, 3, and 4 together). In valuing the subject properties, Bookhout examined ten sales, making adjustments for time, location, size and shape, topography, frontage, and utility. Eight of these ten sales were of properties larger than the largest of the parcels constituting the subject properties. Based on these sales, Bookhout concluded that the fair market value of Parcel 1 was $ 14,000 and the aggregate of the fair market values of Parcels 2, 3, and 4, was $ 34,500. These values represent approximate per-acre values of $ 200 and $ 250, respectively. At the trial, when asked to value Parcel 2 and the aggregate of Parcels 3 and *659 4, separately, Bookhout testified that the values would be $ 27,500 and $ 14,000, respectively. These values represent per-acre values of $ 400 and $ 200, respectively. The market data approach used by both experts in theory involved locating parcels of land which were as physically similar as possible to one or another of the subject properties, and which had been sold within a reasonable time of the contributions of the subject properties. Since no two sales and no two parcels are identical, the actual sales price in each case is then to be adjusted up or down to reflect the differences between the subject property and the comparable property. The estimated values of the comparable properties as so adjusted provide an indication of the value of the subject property on the relevant date. Like most valuation techniques, this method is far from an exact science. However, it is based upon the common sense approach of taking the actual sales prices of properties similar to the subject properties and then relating these prices to the subject properties. This Court has often used this valuation method. See Wolfsen Land & Cattle Company v. Commissioner,72 T.C. 1, 18-21 (1979). We *660 have carefully evaluated all of the opinions, other exhibits, and testimony on direct and cross examination of petitioners' expert and respondent's expert. Each side has spent a great amount of time and effort criticizing the opposition's evidence. Much of the criticism has been valid. Doing the best we can with the data presented by the parties, and gleaning what we can from the experts' conflicting analyses, we have arrived at the conclusions set forth in our Findings of Fact on line (5) of table 1, supra. These amounts are roughly $ 500 per acre for Parcel 1 and an average of $ 600 per acre for the aggregate of Parcels 2, 3, and 4. At the close of the trial in the instant case, respondent asserted that the testimony showed that Parcel 1 was worth $ 5,414 (instead of the $ 14,000 determined in the notice of deficiency) and Parcels 2, 3, and 4 were worth an aggregate of $ 14,525 (instead of the $ 35,000 determined in the notice of deficiency). Whereupon, respondent moved that his answer be amended to assert increased deficiencies for unspecified years in unspecified amounts. The stated basis of this motion is that Audubon was not given the right to develop the subject properties. *661 Bookhout testified that this justified a 65-percent reduction in the determination of the fair market values of each of the subject properties. This "development theory" evidently was a last-minute development. Even at the end of the trial, respondent and Bookhout were struggling to transform the testimony into fair market value dollar amounts. Beach presented no evidence as to the effect on value that resulted from the restrictions on development. Neither expert's written report focussed on the matter. Respondent's motion to amend the pleadings at the conclusion of the trial was denied because it was contrary to the interests of orderly procedure and fair treatment of the parties. On brief, respondent does not renew his motion, yet he asks the Court to take this development theory into account in determining the fair market values of the subject properties. We refuse to give any consideration to this theory. If the theory has legal validity, its practical significance depends on evidence as to the effect that absence of development rights had on the values of the subject properties at the times of their contributions in 1967 and 1969. Petitioners had no opportunity to present *662 such evidence when the matter was raised at the trial and obviously had no opportunity to do so on brief. [6] See Markwardt v. Commissioner,64 T.C. 989, 997-998 (1975). Decision will be entered under Rule 155.
Footnotes
1. In the notice of deficiency, respondent also determined a deficiency for 1966 in the amount of $ 1,238.94. Petitioners have not disputed that deficiency. Accordingly, 1966 is not before us.↩
2. Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the taxable years in issue.↩
3. So stipulated; the deed shows Irene as the only grantor.↩
4. SEC. 170. CHARITABLE, ETC., CONTRIBUTIONS AND GIFTS. (a) Allowance of Deduction.-- (1) General rule.--There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. * * * ↩
5. The parties stipulated that, at the time of their stipulations, both Audubon and NYCT were exempt from income tax under section 501(a) as organizations described in section 501(c)(3). We have found that, during the years before the Court, both organizations were eligible charitable donees of the sort described in section 170(b)(1)(A) (so-called "30-percent organizations", contributions to which were eligible for carryover deduction treatment under sec. 170(b)(5) and, after 1969, sec. 170(d)↩) because the parties appear to have intended this as the substance of their stipulations.
6. In passing, we note that Bookhout commented on the steepness of the grade of the subject properties, the limited access to the subject properties, the rough and rocky condition of the soils on the subject properties, and the existence of a ravine on Parcel 1. He indicated that these factors "limited" or "extremely limited" the use of the subject properties for residential purposes, but would not interfere with their use for recreational purposes. We may suppose that there might be some way to reconcile this evaluation with the same expert's testimony that 65 percent of the subject properties' value inhered in the 1967 and 1969 prospects for development of the property. However respondent has made no effort to present such a reconciliation. This apparent inconsistency demonstrates that respondent's presentation of the evidence on the development theory does not have been surface coherence.↩