ESTATE OF CHLOE A. NAIL, DECEASED, J. H. NAIL, EXECUTOR, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1459–70.   Filed October 26, 1972.

*Whitfield J. Collins, Jack C. Wessler,* and *Harry E. Bartel,* for the petitioner.

*John W. Dierker,* for the respondent.

SIMPSON, *Judge:* The respondent determined a deficiency of $449,-301.65 in the Federal estate tax of the Estate of Chloe A. Nail. Most of the issues have been settled, and the only issue to be decided concerns the valuation of the surface estate in 20,480 acres of land in Shackelford County, Tex.

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioner, J. H. Nail, is the independent executor of the Estate of Chloe A. Nail (the decedent). He maintained his residence in Albany, Tex., at the time the petition was filed in this case. The estate tax return of the Estate of Chloe A. Nail was filed with the district director of internal revenue, Dallas, Tex.

The decedent died on March 21, 1966, owning the surface estate in 20,480 acres of land in Shackelford County, Tex., and an undivided

2/12 interest in the J. H. Nail Oil Trust. Only the valuation of the surface estate is at issue, and the petitioner has duly elected the alternative valuation date of March 21, 1967.

The 20,480 acres (estate property) in Shackelford County extends approximately 5 miles east and west, 6 miles north and south on the westernmost 3 miles, and 7 miles north and south on the easternmost 2 miles. It is bordered on the south by the Chloe A. Nail Trust property and on the east by approximately 27,000 acres of land owned by J. H. Nail individually. The Chloe A. Nail Trust, the Chloe A. Nail estate, and the J. H. Nail properties are operated as one ranching unit.

No public road or highway crosses or abuts the estate property. Two private roads, which cross the property of J. H. Nail and lead to a highway 10 miles away, are the only access to the estate property from the east, and these roads cannot be used without the prior permission of Mr. Nail. The only access from the south is a private road which crosses the Chloe A. Nail Trust land and the W. I. Cook estate, and which leads to a highway approximately 9 miles away. There is no easement to the estate property for the use of any of such private roads. There is no access to the estate property from the west or the north.

Since 1927, at least 460 oil wells have been drilled on the estate property. For the last 15 to 20 years, the wells which were still operating on estate property have been conducting secondary recovery operations. These operations consist of pumping salt water underground so as to move the oil to a location where it can be more easily recovered. In part, because many of the wells have no surface casing, both salt water and oil seepage have occurred resulting in damage to vegetation and pollution of the water on and under the property. Approximately 1,000 acres have been damaged to the extent that they are not productive.

Subject to outstanding leases, the minerals in, on, and under the estate property and an additional 66,000 acres were conveyed in 1950 to the J. H. Nail Oil Trust. The trust instrument contained provisions protecting the owners of the surface estate from oil and salt water damage, but because such provisions did not apply to leases executed before 1950, and because it is often difficult to locate the source of the seepage, the attempts to end the oil and salt water pollution have not been successful.

There is no underground fresh water on the estate property, and the water in the two creeks running across the property is not usable as drinking water for cattle because of its high salt content. The principal means of watering the property is a pumping station located on the property's 1¾-mile frontage on the Brazos River. Water is pumped from the river 5 miles to a hill where there are two concrete reservoirs

from which the water flows by gravity through 45 miles of pipeline to tubs at various locations on the property. The pipeline was originally built in 1920, and 21 miles of the pipe were replaced 19 years ago. The system also extends to the land of J. H. Nail. During dry periods, a large portion of the water is brought in by truck.

Ranching is the highest and best use of the land, and the carrying capacity of the land is 27.2-acres-per-cow unit. There is no tillable land on the estate property, and the only two residences on the property are small, frame, tin-roofed dwellings utilizing cesspools for sewage.

On the estate tax return of the Estate of Chloe A. Nail, the petitioner valued the surface estate in the 20,480 acres at $512,000, and the respondent in his notice of deficiency valued the property at $1,221,823.

OPINION

Before dealing with the substantive issue, we will dispose of a procedural matter. Prior to trial in this case, the petitioner caused a subpoena duces tecum to be served on the respondent commanding the production of the Internal Revenue Service file relating to the Estate of Mildred Scott Conway, deceased, and the respondent filed a motion to quash the subpoena. In contending that the subpoena should not be quashed, the petitioner argues that the file contains information concerning an agreement between the respondent and a representative of the Conway estate as to the valuation of a piece of land adjacent to the southwest corner of the tract involved in this case; that the valuation date of the Conway estate was near the valuation date involved in this case; that there is no evidence of sales of land comparable to the tract herein involved; and that the evidence contained in the file is, therefore, material, relevant, and admissible. The respondent argues that settlements and settlement negotiations in other cases are not proper matters to be considered by this Court; that a settlement arrived at in an unrelated tax case is immaterial; that the prospective witness cannot divulge the information sought without being subject to sanctions; and that, therefore, the subpoena should be quashed.

The subpoena duces tecum is a valid process of this Court permitting a party to obtain documentary proof supporting his case. Sec. 7456, I.R.C. 1954; [1] Rule 44, Tax Court Rules of Practice. The Commissioner or his agents, in appropriate cases, must comply with the commands of such a subpoena. *Blair* v. *Oesterlein Co.*, 275 U.S. 220 (1927). However, the process is not without limitation, and a subpoena will be quashed when it appears that the evidence sought would not be relevant to the decision of the issues presented in the proceeding. See

---

[1] All statutory references are to the Internal Revenue Code of 1954, unless otherwise indicated.

*Hamilton Web Co.*, 10 B.T.A. 939, 941 (1928). Because we find that under the circumstances in this case the subpoenaed records would be irrelevant, we have concluded that the subpoena must be quashed.

It is the policy of the courts to encourage the settlement of civil suits. Revised Draft of Proposed Rules of Evidence for the United States Courts and Magistrates, 51 F.D.R. 315, 353–354 (1971) ; Keir & Argue, Tax Court Practice 73 (1970) ; McCormick, Evidence, secs. 76 and 251 (1954). In view of the very heavy caseload of this Court, it is most important that such a policy be vigorously supported. It is possible that admitting evidence of settlements or settlement negotiations concerning other cases would hinder the settlement of tax cases. Cf. Revised Draft of Proposed Rules of Evidence for the United States Courts and Magistrates, *supra;* McCormick, *supra.* In deciding whether to admit such evidence, that possibility must be weighed against the assistance to be derived from the admission of the evidence.

In the present case, three expert witnesses, two for the petitioner and one for the respondent, prepared and presented appraisals. As the petitioner points out, because of the location, size, and condition of the land to be appraised, there were difficulties in using the comparable-sales method of valuation in this case. Yet, one expert used such method exclusively, one used it in conjunction with the income approach, and one used comparable sales in determining the capitalization rate to be utilized in applying the income approach. Under these circumstances, there is sufficient evidence for this Court to arrive at a valuation without using the evidence as to the value on which the Conway estate was settled. This case, thus, differs from *Righter* v. *United States*, 439 F. 2d 1204 (Ct. Cl. 1971), in which the court believed that it did not have sufficient other reliable evidence of value and, therefore, admitted evidence as to the settlements reached in other unrelated cases.

Moreover, the petitioner apparently seeks only information as to the amount used in the settlement as the value of the Conway ranch. Evidence is relevant when it is likely to be useful in the case. *Boeing Airplane Co.* v. *Coggeshall*, 280 F. 2d 654, 658–659 (C.A.D.C. 1960). The figure as to the value on which the case was settled, alone, would be of no help in this case. We do not know whether there were other issues in the Conway controversy; if there were other issues, there may have been some trading with respect to the various issues—one party could have accepted a less favorable settlement of one issue in return for receiving a more favorable settlement of another issue. See *Fitts' Estate* v. *Commissioner*, 237 F. 2d 729, 733–734 (C.A. 8, 1956), affirming a Memorandum Opinion of this Court; Keir & Argue, *supra* at 76–77. For the information as to the value used in settling the Conway controversy to be useful, we also would need to know more about the

condition of that ranch. A critical question in valuing the Nail ranch is to what extent has the surface been damaged by the numerous oil wells that have been drilled thereon over the years. We do know that the Conway ranch and the Nail ranch adjoin, but we have only vague and general statements as to their comparability. The statements are altogether inadequate for us to determine whether the Conway ranch has also been damaged to a comparable extent by the drilling of oil wells thereon. Thus, the amount at which the Conway ranch was valued for the purposes of settlement would be of no significant help, without more information, in determining the appropriate value of the Nail ranch.

Additionally, the petitioner argues that the valuation of the Conway ranch is relevant because it establishes that the respondent abused his discretion. However, abuse of discretion is not shown by the mere fact that the respondent agreed to a settlement valuation of one tract of land and is now contending for a different valuation of an adjacent tract of land. The two pieces of land, while they might be similar, are clearly not identical. Factors present in the settlement of the Conway estate might not be present in this case, and the evidence available to the respondent in this case might not have been previously available. This case is, thus, clearly distinguishable from that of *International Business Machines Corp.* v. *United States*, 343 F. 2d 914 (Ct. Cl. 1965), certiorari denied 382 U.S. 1028 (1966), on which the petitioner relies, and in which the court found that there was no explanation for the respondent's actions in treating business competitors differently.

When we weigh the advantages and disadvantages of admitting the evidence as to the settlement value of the Conway ranch, we conclude that, in this case, the advantages are not sufficient to outweigh the disadvantages. Obviously, in another setting, the balance might be struck differently.

Now we reach the substantive issue of what was the fair market value of the surface estate in 20,480 acres of land in Shackelford County, Tex., on March 21, 1967. In support of a valuation of $32 per acre, the petitioner primarily relies on the testimony and reports of two expert witnesses. The petitioner's first expert witness assumed that the buyer would operate the ranch and used an income approach of valuation, whereby he prepared average yearly income figures for a normal operator on a property similar in operation and size to the subject property. He then capitalized the projected net yearly income at the rate of 2.25 percent; the selection of that rate was based on the sales price to income ratio of six ranch sales in the area and the experience of the witness. Although the witness believed that the six sales were helpful in computing the capitalization rate, he did not believe that the comparative-sales approach should be used in valuing

the surface estate because of the many differences between the comparative sales and the subject property. He concluded that the value of the estate property was $32 per acre.

In contrast to his first expert witness, the petitioner's second expert witness relied primarily on the comparative-sales approach. He made adjustments to the comparative sales because of such factors as the surface estate's lack of minerals, its size, its location, and the date of the valuation. In addition, he took into account the damaged condition of the subject property and concluded that the fair market value of the subject land was $36.15 per acre. He also presented the lease-income approach in his report whereby he subtracted from the normal lease income for tracts of similar size in the same area the normal expenses of leasing. The value on this basis was $31.58 per acre, but the witness believed that the $36.15-per-acre value arrived at under the comparative-sales approach more accurately reflected the value of the estate land.

The petitioner also places some reliance on the testimony of J. H. Nail that the value was $25 per acre. However, although Mr. Nail has operated a ranch for over 40 years, he is not a professional appraiser, and we do not believe that we should give great weight to his self-serving testimony.

The respondent basically contends that the income approach is not valid in valuing property in West Texas, that the comparative-sales approach should be used exclusively, and that his witness properly applied that approach in valuing the estate land at $58 per acre.

The respondent's contention that the income approach is not valid is based on testimony that the income to be derived from land in West Texas does not justify the purchase price of such land. However, such testimony does not mean that a purchaser would disregard the income-producing aspects of land, and indeed, all the appraisal witnesses indicated that the average yearly income derived from ranches in the area of the subject property approximated between 2 to 3 percent of the fair market value of such ranches. Therefore, we are not presented with a situation in which income yield has no correlation to value, and we find that the income approach is a valid method of valuing land in West Texas. We further find that the petitioner's witnesses properly applied this approach. We also find that the statement in the report of the respondent's witness that the income approach supports a valuation of $60 per acre should be given no weight. The evidence shows that whereas other properties in the area of the estate property rent for $1.25 per acre, the witness considered the rent to be $2 per acre in applying the lease-income approach, and that in applying the owner-operated income approach, he used figures based on the opera-

tion of his own 750-acre ranch in an adjoining county without making any adjustments.

Although the income approach is a method of valuing land in West Texas, it is not the only method and must be considered along with the comparative-sales approach. The need to consider both approaches is especially important in the present case where a change of $1,000 a year in income or 0.25 percent in the yield rate would change the valuation based on the income approach almost $2.50 an acre, and where several substantial adjustments must be made to each sale to use the comparative-sales approach.

We also reject the respondent's contention that we should accept the $58-per-acre valuation of his appraisal witness and conclude that the report should be given little weight. The report of that witness listed five "comparative sales," but on cross-examination, the witness admitted that he relied almost entirely on two sales and that he considered these two sales to be one, because they were jointly negotiated and because the properties involved are now being operated as one ranch. Furthermore, he generally failed to indicate what adjustments were made to the sale price of these properties in arriving at a valuation of $58 an acre. However, he did indicate that a basic premise of his report was that the estate property had access to a public highway, and even the respondent has now conceded that the property had no such access. The respondent argues, nevertheless, that if the estate property was sold, J. H. Nail would provide access to the property and that therefore in valuing the property, we should consider it as having access to a public highway. Although such access might be provided in the event of a sale, it is unreasonable to assume that such access would be provided without charge, and we believe that the cost of obtaining such access must be considered in determining the fair market value of the estate property.

In contrast to the respondent's witness, the petitioner's witness did use several comparative sales, and he carefully explained the adjustments which he made to account for the difference between each comparative sale and the estate property. Furthermore, we have already decided that his comparative-sale valuation was supported by a proper application of the income valuation.

Although we believe that the approach taken by the petitioner's witness is basically sound, we believe that the adjustments which he made for the size and lack of access to the property were excessive. The excessive size adjustment results from the witness treating the sale of a 9,760-acre tract and the sale of a 13,598-acre tract as separate sales even though the sales were jointly negotiated. If the sales are treated jointly, there is no need for a size adjustment, whereas if they are treated separately, there is such a need because all the appraisal

witnesses agree that smaller properties in West Texas generally sell for a higher price per acre than larger properties. The petitioner argues that the sales should be treated separately because different persons purchased the properties. Yet, the evidence indicates that the properties were sold by one person, that the buyers were members of one family, that the sales were jointly negotiated, and that the properties are operated as one ranch. We, therefore, find that no size adjustment should have been made with respect to these properties and that their sale should be treated as one sale.

In making an adjustment for the lack of access to the estate property, the witness apparently considered the cost of obtaining an easement across the J. H. Nail land. However, he did not take into account the fact that the J. H. Nail land benefits from the pumping system on the estate property, and that the cost of obtaining an easement, therefore, should be partially offset by an appropriate charge for such benefit.

We do not agree with the respondent's contention that the adjustment which the witness made to account for the estate property's lack of mineral rights and damaged condition were also excessive. In making adjustments for the surface estate's lack of mineral rights, the witness considered that, without the ownership of such rights, the owner of the surface estate had only limited control over who entered the property. The respondent contends that the oil below the estate soon will be depleted and that the oilfield traffic will become minimal. However, the respondent does not claim that the present amount of traffic is minimal and the evidence does not indicate that the secondary recovery operations will be significantly reduced in the near future.

The respondent also contends that the deceased owned an undivided 2/12 interest in the J. H. Nail Oil Trust which could be sold with the land. However, the 2/12 interest was in minerals "in, on and under" land of which the estate property was only a part, and the interest could be sold only after it was first offered to the other beneficiaries of the trust. Furthermore, it is not apparent how the ownership of such an interest would reduce the oilfield traffic on the estate property, and the interest itself has already been valued by the parties.

The contention that the witness exaggerated the extent to which the estate was damaged seems to be based on the assumption that only 1,000 acres of the estate were damaged. However, it is clear that the oil and salt pollution also rendered the underground and stream water unfit for even the cattle to drink, and it appears that the 5-percent, or 1,000-acre, figure refers only to land which has been damaged to the extent that it is not productive. Furthermore, the appraiser who testified to the 5-percent figure upon which the respondent relies indicated

that, in using the comparative-sales approach, the petitioner's witness accurately reflected the extent to which the surface estate was damaged. Finally, the evidence shows that the estate property was more damaged than any of the comparable properties; that before the witness made the adjustment for such excess damage, he had considered the adjusted prices of the comparative sales upon which he primarily relied to be between $36 and $39 per acre; and that after the adjustment, he concluded that the subject property had a value of $36.15 per acre. Under these circumstances, we do not believe that the witness exaggerated the extent to which the estate had been damaged.

The respondent further contends that the petitioner overemphasized the extent to which repairs would have to be made on the water pipeline system. However, after carefully examining the appraisal reports of the witnesses and evaluating their testimony, we have concluded that the petitioner's expert witnesses did not overemphasize the need for repairs in making their valuations.

After carefully considering all the evidence, we are of the opinion that the value of the surface estate determined by use of the comparable-sales method should be greater than that suggested by the petitioner's expert witness; it should be increased by reason of a reduction in the adjustment for size, because of our finding that two of the comparative sales of property should be treated as one, and a reduction in the adjustment for the cost of acquiring the easement to the highway, because of our finding that such cost should be offset by the cost of supplying water to the other ranches. When the value so determined is weighed against the value determined by use of the income method, we find and hold that the fair market value of the estate property was $40 per acre on the valuation date.

*Decision will be entered under Rule 50.*