ANTHONY IMBESI and HAZEL IMBESI, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Imbesi v. Commissioner
Docket No. 8522-77.
United States Tax Court
T.C. Memo 1981-484; 1981 Tax Ct. Memo LEXIS 262; 42 T.C.M. (CCH) 977; T.C.M. (RIA) 81484; September 2, 1981. *262 Held, fair market value of land contributed to charity determined. Lawrence T. Imbesi, for the petitioners. Mark E. Kropiewnicki, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined a deficiency of $ 16,418.79 in the petitioners' Federal income tax for 1974. After concessions by the petitioners, the sole issue for decision is the fair market value of a parcel of land which the petitioners donated to the State of New Jersey. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioners, Anthony and Hazel Imbesi, husband and wife, resided in Estell Manor, N.J., at the time they filed their petition in this case. They filed their *263 joint Federal income tax return for 1974 with the Internal Revenue Service. On December 28, 1973, the petitioners contributed 102.66 acres of land (the land or the Imbesi land) to the State of New Jersey. Such land is located approximately 6 miles southeast of Millville, Maurice River Township, Cumberland County, New Jersey. Mr. Imbesi had purchased the land in 1955 for approximately $ 2,000, a price of approximately $ 20 per acre, as part of 3 tracts of land containing a total of 2,053.92 acres. The land is rectangular in shape and, at the time of the gift, was unimproved and heavily wooded with scrub pine and similar growth; it is level in grade and well drained. It is bisected by State Highway 49, which passes through the land in a northwest to southeast direction for a distance of 2,400 feet. State Highway 49 is a 24-foot wide paved asphalt road with gravel shoulders. Such highway leads from the Delaware Memorial Bridge to Tuckahoe, N.J., and the New Jersey seashore points. The depth from the State highway to the back property line of both the northern and southern halves of the land is at least 1,000 feet. Completely surrounding the land is the Peaslee Fish and Wildlife *264 Management Area (the Peaslee area), an approximately 16,000-acre tract owned and operated by the New Jersey Division of Fish and Game and Shell Fisheries. Maurice River Township is an area of 94.7 square miles located in the eastern section of Cumberland County. The area is basically rural in character. In 1960, the population of Maurice River Township was 3,105; in 1970, it was 3,743; and in 1972, it was estimated to be 4,285. With the exception of electric and gas service, there are no public utilities in the area; water and sewage are handled individually for each property. During 1973, there was no large demand for residential housing in Maurice River Township. During 1973, there were in effect in Maurice River Township both a zoning ordinance and a subdivision ordinance. The Imbesi land is located in an area of Maurice River Township which was planned to be one of low growth. Such land is zone R-1: single-family residences on a minimum lot size of 3 acres with 300 feet of road frontage as well as side yard, curbing, street, and drainage requirements. The Maurice River Township zoning board has a history of not granting zoning variances. The DeCarlo subdivision, *265 consisting of approximately 750 acres, was started in Maurice River Township in the early 1960s prior to the adoption of the subdivision ordinance, and accordingly, it was not subject to such ordinance. The lots in that subdivision were each one-third acre and were sold for $ 2,384 per lot, with no downpayment and $ 10 per week for 5 years. By the time of trial, 1,100 or 1,200 of such lots had been sold. However, the zoning ordinance, containing the 3-acre minimum lot size provision, was adopted in 1970. Before its adoption, only two houses had been constructed in the subdivision. After the adoption of the zoning ordinance, the township took the position that for houses to be constructed, the builder had to have a minimum of 3 acres, and when variances were requested from that requirement, the requests were denied. In determining the amount of their charitable contribution deduction for 1973, the petitioners valued the land at $ 260,000, $ 2,500 per acre, based on an appraisal by Harrison L. Todd dated May 24, 1974. [1] Due to the limitations of section 170(b) of the Internal Revenue Code of 1954[2] on allowable charitable deductions, for 1973, the petitioners *266 claimed a deduction with respect to the land in the amount of $ 55,707.58. On audit, the Commissioner determined that the fair market value of the land on December 28, 1973, was only $ 90,000.00. For 1973, the Commissioner allowed the petitioners a charitable contribution deduction with respect to the land of $ 62,964.08, an increase of $ 7,256.50 over the amount claimed by the petitioners for such year. Such increase was due to an increase in the petitioners' adjusted gross income, as determined by the Commissioner, which resulted in an increase in the amount of charitable deductions allowed the petitioners for 1973. The petitioners agreed to such determination. On their 1974 return, the petitioners claimed a charitable contribution deduction in the amount of $ 21,090.45. Such deduction was based on a carryover of an excess contribution from 1973 to 1974 with respect to their donation of the land. In his notice of deficiency, *267 the Commissioner allowed the petitioners a charitable contribution deduction with respect to the land of $ 27,035.92, an increase of $ 5,945.47 over the amount claimed by the petitioners on their 1974 return. Such increase was due to an increase in the petitioners' adjusted gross income, as determined by the Commissioner, which resulted in an increase in the amount of charitable deductions allowed the petitioners for 1974. The petitioners do not contest the Commissioner's increase in their adjusted gross income for 1974. The Commissioner also determined that there was no carryover of excess charitable contributions from 1974 to 1975 with respect to the land. In his amended answer, based on an appraisal by Robert C. Shipley, Jr., the Commissioner determined that the fair market value of the Imbesi land as of December 28, 1973, was $ 41,000, rather than $ 90,000 as he had determined in the notice of deficiency. Thus, the Commissioner determined that there was no carryover of an excess contribution to 1974, since the deduction allowed the petitioners on their 1973 return exceeded the fair market value of the land. Accordingly, the Commissioner contends that the petitioners' taxable *268 income for 1974 was understated by $ 27,035.92 and that the correct deficiency for 1974 is $ 16,418.79, rather than $ 4,206.91 as determined in the notice of deficiency. OPINION Section 170 allows an individual who makes a charitable contribution a deduction in the year such contribution is actually paid with limitations on the amount deductible in that year and with a carryover of any excess contribution. See sec. 170(b) and (d). If a charitable contribution is made in property other than money, the amount of the contribution is the fair market value of the property at the time of the contribution. Sec. 1.170A-1(c)(1), Income Tax Regs. Fair market value is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Sec. 1.170A-1(c)(2), Income Tax Regs.
The determination of the fair market value of a piece of property at a given date is a question of fact to be resolved from a consideration and weighing of all relevant evidence in the record. Kaplan v. Commissioner, 43 T.C. 663, 665 (1965). The petitioners *269 have the burden of proving that the fair market value of the Imbesi land on December 28, 1973, exceeded $ 90,000, the amount determined by the Commissioner in his notice of deficiency. Rule 142(a), Tax Court Rules of Practice and Procedure; Welch v. Helvering, 290 U.S. 111 (1933). The Commissioner has the burden of proving that the fair market value of the land was less than $ 90,000. Rule 142(a), Tax Court Rules of Practice and Procedure; Fowler v. Commissioner, 6 B.T.A. 250 (1927). The petitioners' valuation of the Imbesi land is based primarily on Mr. Todd's appraisal. Mr. Todd is a member of the American Appraisal Institute of Real Estate Appraisers, is past president of the Camden Chapter of the Society of Real Estate Appraisers, is a past president of the New Jersey Association of Real Estate Boards, and is a past vice president of the National Association of Real Estate Boards. He has been a real estate broker for 40 years and, for the past 35 years, has specialized in the appraisal field. In determining the fair market value of the Imbesi land, Mr. Todd used the comparable sales or market data approach, comparing such land to other land *270 sales in Maurice River Township based on the highest and best use of the land as a residential subdivision. Mr. Todd used the following six comparable sales: Size in
Price Per
Sale
Date
Location
Acres
Acre
1
9/28/73
Maurice River
8.5 $ 1,588
Township
2
6/8/73
"
15.0 1,000
3
1/80/74
"
6.3 810
4
10/8/73
"
33.0 1,000
5
10/25/73
"
31.69
884
6
various
"
.33
7,000
Sale number 1 involved property located 2,000 feet west of the Imbesi land. It was a triangular-shaped parcel without improved road frontage. The land had two summer houses and a barn on it. However, such improvements added little to the value of such land. Sale number 2 included three contiguous parcels of unimproved land located along the Tuckahoe River. Sale number 3 involved an irregular-shaped parcel of unimproved land with 419.5 feet of improved road frontage. It adjoined the Pennsylvania-Reading Railroad. Fifty percent of such land was cleared, and the remainder was covered with brush. Such sale actually included 9.7 acres, but Mr. Todd treated it as a sale of only *271 6.3 acres because the remainder was "meadowland" (low-lying land subject to wetness) which he considered to be worthless for subdivision purposes. The property in sale number 4 was an irregular-shaped parcel of unimproved land with approximately 2,000 feet of frontage on a State highway Sale number 5 involved a parcel of unimproved land with frontage on an improved road. It was located approximately 5.5 miles south/southwest of the Imbesi land. The land in sale number 5 was level, and large portions of it were cleared; it had a nonproducing gravel pit. Mr. Todd considered the presence of the gravel pit as detracting from the value of such land for subdivision purposes. Sale number 6, which Mr. Todd considered the most comparable, involved sales of lots in the DeCarlo subdivision. That subdivision was located near the Imbesi land and was bordered in part by the Peaslee area and in part by the Owens Illinois Sand Company. Lots within such subdivision were sold on the installment basis for $ 2,384 per lot. Mr. Todd assumed that the Imbesi land could be sold on a similar basis. To compute what a developer would pay for such land by reference to prices of the DeCarlo lots, Mr. *272 Todd assumed that the development cost per acre of the land would be $ 2,000 and that a developer would require a 100-percent profit on his land cost. Thus, using the DeCarlo lot sales as a comparable, he computed the value of the Imbesi land at $ 2,500 per acre ($ 7,000 - $ 2,000 = $ 5,000./. 2 = $ 2,500). In 1978, Mr. Todd's appraisal was reviewed by Sidney L. Brody, who has been a real estate appraiser for 15 years. He is a senior review appraiser and is a member of the National Association of Review Appraisers. Mr. Brody lived in Vineland, N.J., which is 18 miles from the Imbesi land. Mr. Brody concurred with Mr. Todd's appraisal and estimated the fair market value of the land at $ 265,000 to $ 275,000. Mr. Brody believed, as did Mr. Todd, that the land's location, completely surrounded by the Peaslee area, increased its value. Also, although smaller parcels generally sell for a higher price per acre, Mr. Brody believed that a large assembled tract, such as the Imbesi land, might have a greater value per acre than a smaller parcel. Mr. Brody only inspected the Imbesi land and the DeCarlo subdivision. He did not determine if there were other comparable sales. Neither *273 Mr. Todd nor Mr. Brody was aware that Maurice River Township's zoning and subdivision ordinances required a minimum lot size of three acres for development and sale of the Imbesi land. The Commissioner's valuation of $ 41,000, $ 400 per acre, was based on an appraisal by Mr. Shipley, who was employed by the IRS and had been so employed for 19 years. He was a member of the American Society of Appraisers and was a certified review appraiser. In determining the fair market value of the Imbesi land, Mr. Shipley also used the comparable sales or market data approach and considered the highest and best use of the land to be for a residential subdivision. He secured information about 17 sales, but he relied only on those sales which involved 25 acres of land or more, since in his opinion, the possibility of error in adjusting for sales of smaller parcels was too great when other larger comparables were available. Of his 17 sales, Mr. Shipley considered the following as most comparable to the Imbesi land: Size in
Price Per
Sale
Date
Location
Acres
Acre
2
2/1/72
Maurice River
80.81
$ 69
Township
4
4/3/72
"
25.00
233
8
6/22/73
"
57.00
193
*274 Sale number 2 involved a rectangular-shaped parcel of unimproved land 1.5 miles south of the Imbesi land. It jutted into the Peaslee area; it was flat, sandy, and covered with pine and secondary-growth timber. It fronted on an unimproved road and had a relatively small ratio of road frontage to acreage. The land in sale number 2 was developed into a subdivision known as Green Acres; there were no residences on such land. Sale number 4 involved an unimproved parcel of land which was divided into 5 lots of 5 acres each and was approximately 5 miles north/northeast of the Imbesi land. A portion of the land in sale number 4 was cleared, and it had some secondary-growth timber. Such land fronted on a dirt road. The land in sale number 8 was unimproved and was approximately 2 miles northwest of the Imbesi land. The land involved in such sale was level and was covered with heavy secondary-growth timber; it fronted on a gravel road and had a relatively small ratio of road frontage to acreage. Mr. Shipley considered Mr. Todd's sales numbers 1, 3, 4, and 5 but decided that such sales were less comparable than his sales numbers 2, 4, and 8. He rejected Mr. Todd's sales numbers 1 and *275 3 as too small to be valid comparables, because such sales involved less than 25 acres each. Also, the land in Mr. Todd's sale number 1 had improvements upon it, which Mr. Shipley estimated accounted for 85 percent of the sales price. Mr. Shipley considered Mr. Todd's sale number 4 to be an aberration, since approximately 3 years later the land was resold, together with 15 acres of other land, for only $ 400 per acre. Mr. Shipley believed that the gravel pit on the land in Mr. Todd's sale number 5 increased the value of the land and, therefore, made such sale a less valid comparable. Mr. Shipley did not use sales within the DeCarlo subdivision as a comparable. He examined such sales but concluded that the potential for error in adjusting the sales price of a.33-acre parcel to the sales price for a 102-acre parcel was too great to warrant their use. Mr. Todd, Mr. Brody, and Mr. Shipley were all highly qualified and experienced real estate appraisers. They all used the comparable sales or market data approach to determine the fair market value of the Imbesi land, and that approach is a recognized method of determining the fair market value of unimproved land. Wolfsen Land & Cattle Co. v. Commissioner, 72 T.C. 1, 19 (1979); *276 Estate of Fawcett v. Commissioner, 64 T.C. 889, 899 (1975); Estate of Nail v. Commissioner, 59 T.C. 187, 193 (1972). They all agreed the highest and best use for the land was as a residential subdivision. Yet, they reached vastly different conclusions as to the fair market value of the Imbesi land on December 28, 1973. They did so because, in our opinion, the conclusion of Mr. Todd and Mr. Brody was much too high and that of Mr. Shipley, much too low. In reaching their conclusions, Mr. Todd and Mr. Brody relied primarily on the sales of the DeCarlo lots, but we find such information to be far less persuasive. In the first place, any development and sale of lots in the Imbesi land would be subject to the 3-acre minimum lot requirement, and that fact would reduce significantly the amount that could be realized by a sale of the Imbesi land. In addition, there was, at that time, a substantial doubt as to whether there was sufficient demand for residential property in Maurice River Township to warrant the development of a new large subdivision. Finally, to determine what a developer would pay for the Imbesi land by reference to the price at which the *277 DeCarlo lots were sold, Mr. Todd had to make assumptions as to the likely development costs and the markup that a developer would expect. In view of his long experience, we accept that his method may be sound and his estimates reasonable, but nevertheless, they are merely estimates. They may represent the thinking of a developer and reflect the maximum amount that he would pay for the Imbesi land to develop it profitably; yet, any prospective purchaser is going to examine the other sales of unimproved lands in the area and is not going to pay more than similar land is being sold for in that area. Thus, we believe that the other sales of unimproved land in Maurice River Township provide a more reliable indication of the fair market value of the Imbesi land. On the other hand, Mr. Shipley refused to consider seriously any sale of a tract of land of less than 25 acres, but in our opinion, the size is merely a factor to be considered in judging the comparability of sales. See Estate of Fawcett v. Commissioner, supra; Estate of Nail v. Commissioner, supra. The sales on which he did rely all require some material upward adjustments. Some of *278 his sales were more remote in time, and all involved less desirable land. He refused to give adequate consideration to the fact that the Imbesi land was surrounded by the Peaslee area and the fact that such land had a large frontage on an improved road; those facts made the Imbesi land considerably more valuable than his comparables. Also, we cannot accept his conclusion that Mr. Todd's sale number 4 was an aberration. The resale of that property occurred more than 3 years later and included other property, the value of which is unknown by us. In our judgment, the most significant comparable sales were Mr. Todd's sales numbers 1, 2, and 4. Some adjustment must be made in the price of sale number 1 because of the improvements, but we have found that the improvements did not account for a significant part of such price. The land in sale number 2 was located on a river. However, none of the properties in Mr. Todd's sales numbers 1, 2, and 4 had the advantage of the large frontage on an improved road or the proximity to the Peaslee area possessed by the Imbesi land. When we consider and weigh the information concerning the comparable sales, we find and hold that the fair market *279 value of the Imbesi land on December 28, 1973, was $ 1,200 per acre. Decision will be entered under Rule 155. Footnotes
1. Mr. Todd computed the fair market value of the land based on a total acreage of 104 acres rather than the stipulated acreage of 102.66 acres. ↩
2. All statutory references are to the Internal Revenue Code of 1954 as in effect during 1973 and 1974.↩