MARVIN J. BUTLER and JOANN J. BUTLER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; JAMES ARTHUR TIMOTHY and LAWANA TIMOTHY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Butler v. Commissioner
Docket Nos. 19158-84, 19159-84.
United States Tax Court
T.C. Memo 1985-613; 1985 Tax Ct. Memo LEXIS 17; 51 T.C.M. (CCH) 126; T.C.M. (RIA) 85613; December 17, 1985. R. LaMar Bishop, for the petitioners. Richard W. Kennedy and Thomas N. Thompson, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in, and additions to, petitioners' Federal income tax for the taxable years 1979 and 1980 as follows: Additions to Tax
Taxpayers
Year
Deficiency
Sec. 6653(a) [1]
Marvin J. and
Joann Butler
1979
$6,954
$348
1980
12,844
642
James A. and
Lawana Timothy
1979
4,563
228
1980
10,873
544
*18 After concessions by the parties, the issues for decision are: (1) the fair market value of a coal lease donated by a partnership in which petitioners were partners to a qualified organization described in section 170(c), and (2) whether petitioners are subject to the addition to tax for negligence under section 6653(a). FINDINGS OF FACT Some of the facts in this case have been stipulated by the parties. The stipulation of facts and the exhibits attached thereto are incorporated by this reference. Petitioners Marvin J. and Joann J. Butler, husband and wife, resided in Sandy, Utah, at the time they filed their petition in this case. Marvin J. and Joann J. Butler timely filed joint Federal income tax returns for the taxable years 1979 and 1980. [2]
Petitioners James A. and Lawana Timothy, husband and wife, *19 resided in Altonah, Utah, at the time they filed their petition in this case. James A. and Lawana Timothy timely filed joint Federal income tax returns for the taxable years 1979 and 1980. [3]
On their Federal income tax returns for the taxable year 1979, Butler and Timothy (also referred to as petitioners) each claimed a charitable deduction in the amount of $254,000 representing the claimed value of their interests in a coal lease donated to a qualified organization described in section 170(c). Petitioners could each utilize only a portion of the large charitable deduction on their Federal income tax returns for the taxable year 1979. The unused portion of the $254,000 charitable deductions was, therefore, carried over to subsequent years, pursuant to section 170(d), and deducted, in part, on their Federal income tax returns for the taxable year 1980. Pursuant to the Ordinance of 1985, territories and lands acquired by the United *20 States were surveyed and townships platted. Each township was divided, insofar as practicable, into 36 sections each consisting of 640 acres. Section 16 of each township was granted to the states for the purpose of financing public education. The practice of the State of Utah with regard to lands so received to finance education has been to lease the mineral interests, rather than to sell them. The State of Utah normally auctions the mineral interests by sealed bid. If no bids are submitted, a lease may be acquired for a small per acre rental payable annually plus a royalty based on any minerals extracted. The State of Utah granted coal lease number 31553 to Noel S. Tanner, Dick E. Bastain, and Ted L. Hanks on February 24, 1975. No sealed bids were received for this lease and it was let for the minimum annual rental of of $ .50 per acre. Lease number 31553 granted a lease to extract any coal lying under Section 16 of Township 12 South, Range 10 East, Salt Lake Meridian, Carbon County, Utah (hereinafter referred to as Section 16). The lease on Section 16 was for a period of 10 years and for as long thereafter as coal was produced in commercial quantities. The royalty was calculated *21 as the greater of 4 percent of the gross value of the coal produced at the mine or the rate prevailing for Federal leases on land of similar character under coal leases issued by the United States at that time. Based upon a lease granted by the U.S. Department of the Interior, Bureau of Land Management (BLM), the prevailing royalty for Federal leases in 1979 was 10.4 percent of the gross value of mined coal. On August 24, 1977, articles of limited partnership were executed in the name of Section 16 Coal Partnership. Section 16 Coal Partnership (also referred to as the partnership) consisted of eight limited partners, including petitioners Butler and Timothy, and two general partners. The partners each made initial capital contributions of $5,000 for a total of $50,000. On the same day Noel S. Tanner, Dick, E. Bastain, and Ted L. Hanks, who were not members of Section 16 Coal Partnership, assigned their leasehold interest in Section 16 to the partnership for a payment of $50,000. Section 16 Coal Partnership filed Form 1065, U.S. Partnership Return of Income for the taxable year 1979. This return showed an ordinary loss of $640 attributable to the annual payment under the Section *22 16 lease. On December 28, 1979, the partners of Section 16 Coal Partnership each contributed their 10-percent interest in the Section 16 lease to Brigham Young University (BYU). The partnership made no efforts to develop coal production on Section 16, nor was any serious effort made to sell the lease prior to the contribution to BYU. At the time the lease was contributed, approximately 5 years remained on its 10-year term. The claimed total value of the lease was $2,540,000 or $254,000 for each partner's 10-percent interest. [4]
Section 16 is located in central Utah approximately 10 miles from the town of Helper. The tract is situtated in the Castlegate area of the Book Cliffs coal field. Initial production *23 of coal from this area occurred near the turn of the century. In the Castlegate area coal beds are generally found in what is known as the Blackhawk formation of Cretaceous age. The Blackhawk formation contains several identified coal beds, but only two, the Castlegate "A" and the Castlegate "D," [5] have yielded significant production. The coal in the Castlegate area is considered a high BTU, high volatile bituminous coal with low ash and sulfur content. A good market exists for this coal. Section 16 is located approximately 3-1/2 miles north, northeast from the natural surface outcrop of the coal-bearing Blackhawk formation. Until about 1965 American Electric Power (AEP) operated a coal mine in the area of the outcrop. The AEP mine entrance was located at an elevation of approximately 6,240 feet above mean sea level. Mining of the Castlegate "A" and "D" coal beds continued at the AEP mine in a generally northerly direction until mining operations ceased. At that time the mined area came to within 2 miles south, southwest of Section 16. Due to the relative *24 consistency of the coal beds in the Castlegate area and the absence of major stratigraphic faults and folding, the surface outcrop and the subsurface extent of the AEP mine represent data points from which the existence of coal at Section 16 may be inferred. Other data points, represented by test wells drilled closer to Section 16 than the AEP mine, show the presence of the Castlegate "A" and "D" coal beds, and increase the probability that those beds also would be found beneath Section 16. The test well data points also indicate the possible presence of a third coal bed of commercial size, the Castlegate "F." The nearby data points do not conclusively demonstrate the presence or amount of coal beneath Section 16; they merely suggest an unquantified, although high, probability that coal could be found there in the projected quantities. No natural coal outcrop exists, nor have any test wells been drilled, on Section 16. Most of the coal in Section 16 lies beneath 3,000 - 3,200 feet of non-coal-bearing rock formations or overburden. Although coal is mined at such depths in the United States only in rare instances, present mining techniques will allow recovery of a substantial *25 portion of reserves below 3,000 feet. The method of mining that would be used at the depths that would be encountered on Section 16 will generally allow recovery of 70-80 percent of in-ground reserves at depths exceeding 2,000 feet. Recovery will be reduced at greater depths. At some undetermined depth mining becomes impractical using present mining technology. The tremendous pressures caused by thousands of feet of overburden first reduce the percentage yield and then preclude safe mining altogether. There are two possible methods of gaining access to the Section 16 coal reserves: the rock tunnel or vertical shaft method and the drift method. The rock tunnel method requires digging a vertical or slanted hole through the rock overburden through which mining machinery and personnel can be lowered from the surface to the coal-bearing formations. The drift method is so-named because the underground coal beds are reached or drifted onto by mining from the surface outcrop along the course of the coal beds or from adjacent coal mines. The drift method is generally cheaper than the vertical shaft method. However, where the distance from the mine face to the surface outcrop becomes *26 great, construction of a vertical shaft may be a less expensive way to bring the coal to the surface than hauling it through the mined bed. It would be less expensive to gain access to the reserves of Section 16 by drifting from the AEP mine portal, than to dig a vertical shaft. Construction of a vertical shaft through the overburden on Section 16 at its thinnest point could cost as much as $35-40 million. None of the 22 coal mines operating in Utah in 1979 used a vertical shaft to gain access to coal beds. Furthermore, no Utah mines were being mined below 3,000 feet of overburden in 1979. The AEP mine south of Section 16 had been mined beneath between 2,200 and 2,400 feet of overburden. However, due to a regional northerly dip [6] of approximately 5-1/2 degrees in the stratigraphy of the Book Cliffs coal fields, continued mining of the AEP mine in a northerly direction would be under greater overburden. The charitable deductions claimed by both petitioners in the amount of $254,000 are *27 based on a value of $2,540,000 for the entire Section 16 lease. The $2,540,000 value was recommended by one of the partnership's general partners by letter dated January 15, 1980, and was based on reports supplied by Donald R. Olsen (Olsen), one of petitioners' experts. Olsen's initial report of May 26, 1978, projected probable coal reserves under Section 16 based on the existence of three coal-bearing beds. His estimate for three beds, the Castlegate "A," "D," and "F," yields total reserves of 25,400,000 tons of coal. His first report noted that AEP had purchased coal in the Castlegate area for $ .18 per recoverable ton in 1974. [7] These tracts (the Braztah lease) lie immediately adjacent to the AEP mine face. As a result, access to the reserves is readily available by drifting from AEP's mine. A premium is generally paid for reserves located adjacent to an existing mine face if those reserves are needed to continue operations. At its nearest point, Section 16 lies approximately 1-1/2 miles to the north of this tract. From the $ .18 per recoverable ton sale price, Olsen inferred a value of $ .09 per ton for total coal reserves in place. Olsen then adjusted the $ .09 figure based *28 on inflation to arrive at a recommended value of $ .10 per ton in place for the Section 16 reserves. By report dated December 21, 1979, Olsen again advised the Section 16 Coal Partnership as to the value of the lease contributed to BYU. Olsen suggested that the best way to value the Section 16 lease would be to look to comparable sales: Perhaps the best approach for you to follow would be to calculate the value of the coal (or lease) on the basis of what you would accept for the property (or the maximum that someone is willing to offer you for it). I think that would be its value to you. * * * The values that apply to coals close to the outcrop may not apply to coal, such as yours, that is well behind the outcrop. Access to your coal will be expensive and may well depend on prior development of the adjoining *29 land to the south. So you are left in the position of making an estimate based on known lease values in your general area. * * * In his second report Olsen again concluded that $ .10 per ton in place was an acceptable figure for the fair market value of the Section 16 lease. Olsen did not explain upon what comparable lease values, if any, the $ .10-per-ton lease value was based. Olsen reaffirmed his recommendation concerning the value of the Section 16 lease by a report dated June 18, 1982. Olsen's third report again determined potential reserves of 25.4 million tons in place. In this report, Olsen selected three comparable coal sales to support his $ .10-per-ton recommendation for the Section 16 reserves. Olsen selected as a comparable, a sale from BLM in Rilda Canyon sale which occurred in May 1982.The Rilda Canyon sale was a coal lease of a 640-acre Utah tract with estimated reserves of 7,480,000 for almost $ .70 per recoverable ton. The Rilda Canyon tract does not contain a surface coal outcrop, but the report indicated that the bid was higher than expected "because of the property's strategic position." Unlike Section 16, Rilda Canyon tract's reserves were probably confirmed *30 by test well data in keeping with the Federal Government practice of drilling test wells on all tracts to be sold. The second comparable chosen by Olsen, the North Horn Mountain tract, was another Federal tract offered for sale. Estimated reserves probably also were confirmed by test well data. Although the announced minimum acceptable bid was stated to be $ .35 per recoverable ton, no bids were made and the tract was not sold. The third coal lease sale selected by Olsen was a Book Cliffs tract purchased by Sunedco in February 1982 for $1.42 per recoverable ton. A portion of this tract was purchased by the seller in 1976 at a cost of $ .14 per recoverable ton. This tract contained a surface coal outcrop, and test wells were drilled to confirm reserves. Petitioners' second expert, M. C. Godbe, III (Godbe), found Olsen's recommendation of $ .10 per ton in place to be well within the "industry standard." Godbe also found Olsen's estimation of the presence of 25.4 million tons of coal reserves under Section 16 to be reasonable. Godbe determined that the presence of a third coal bed containing coal reserves in commercial quantities, the Castlegate "F" was reasonably assured. Godbe *31 determined that the overburden exceeding 3,000 feet did not make the reserves unmineable with methods then in use in Utah. Godbe stated in his report that "[e]ntry by vertical shaft or rock tunnel could economically access the property based upon inferred reserve figures alone." Concurring with Olsen's valuation calculations, Godbe stated that "Fair Market Value can best be established by the price a willing seller will accept and what a willing buyer will pay." Godbe relied heavily upon the AEP purchase of the Braztah lease in 1974 for $ .18 per recoverable ton as a comparable sale. Godbe also relied on other sales, but his report does not demonstrate whether the sales were of property substantially similar to Section 16. Petitioners' third expert, R. J. Bowen (Bowen), also concurred in a valuation of $ .10 per ton of coal in place for the Section 16 reserves. Bowen's valuation was also based on a comparison of other sales of coal property in the Book Cliffs coal fields. Bowen relied on the comparable sales selected by Olsen to make his estimation of the value of the reserves underlying Section 16. Bowen considered the February 1982 sale to Sunedco for $1.42 per ton of *32 recoverable coal to be a comparable sale for the purpose of valuing Section 16's reserves. Reserves underlying this tract were estimated to be approximately 240 million tons of coal. Bowen's report does not indicate the depth of overburden on this tract. Bowen found the Rilda Canyon tract comparable to Section 16 because, among other things, both tracts contain no surface outcrop of coal within their boundaries. Bowen's report does not reveal whether Rilda Canyon lien adjacent to an existing underground coal mine face nor does it indicate the depth of overburden present on this tract. Bowen's report emphasized the feasibility of mining coal under the amount of overburden expected to be found on Section 16. At one location in the area in 1979, mining was in progress under 2,400 feet of overburden, with plans to go even deeper. Bowen also reported that the coal beneath Section 16 could be reached by use of a vertical shaft. Bowen estimated that the Section 16 reserves, if accessible, would support mining operations extracting 700,000 tons of coal per year for 20 years. Respondent's sole expert, Robert E. Cohenour (Cohenour), placed a value of $857,088 on the Section 16 coal reserves. *33 To arrive at his valuation of the Section 16 reserves, Cohenour first calculated the probable total amount of coal underlying Section 16 as 28,569,600 tons, a figure somewhat larger than that estimated by petitioners' experts. Cohenour then discounted the total estimated reserves based on the unquantified probability that the reserves projected to underlie Section 16 will not exist or will be less than projected. Cohenour selected, without the benefit of a calculation of the actual mathematical probabilities, a discount factor of 60 percent. The application of this discount factor, which Cohenour selected because of the distances of Section 16 from known data points, yielded 17,141,760 tons of what Cohenour termed Adjusted Coal Reserves. He then further reduced his figure for Adjusted Coal Reserves by 50 percent to arrive at 8,570,880 tons of recoverable reserves. The 50-percent reduction used by Cohenour was based on the recommendation found in U.S. Geological Survey Circular 891, [8] which provides guidelines for coal resource classification, to account for the coal left unmineable due to, among other things, the mining techniques applied. The same publication recommended using *34 local recovery factors if they are available. Local recovery percentages in the area of Section 16 actually ranged from 70 to 80 percent. Cohenour then multiplied recoverable reserves, 8,570,880 tons, by a value of $ .10 per recoverable ton to arrive at a total value for the Section 16 reserves of $857,088. The $ .10 per recoverable ton was selected because Cohenour had been using that factor since the 1960's. Cohenour also relied on petitioners' experts to arrive at his valuation of $ .10 per recoverable ton for the reserves under Section 16. The figure used by petitioners' experts was $ .10 per ton in place.
Alternatively, Cohenour stated that the primary value of the Section 16 lease would be in its potential resale to mining companies who would exploit the coal reserves. He recommended a value of $10,000 for the "purchase or option to purchase the undeveloped lease" in 1979. In his statutory notices of deficiency mailed to petitioners, the Commissioner disallowed in full the claimed charitable deductions for the contribution of petitioners' interests in the Section 16 lease for the taxable years 1979 and *35 1980. The Commissioner also imposed additions to tax under section 6653(a) for each petitioner for the taxable years in issue. ULTIMATE FINDING OF FACT The coal lease of Section 16 had a value of $50,000 when donated to BYU in 1979. OPINION Section 170 authorizes a deduction for any charitable contribution. If the charitable contribution is of property, the measure of the charitable contribution is the fair market value of the property. Sec. 1.170A-1(c)(1), Income Tax Regs. The first issue before us is the fair market value of the coal lease, which was donated to a qualified charitable organization within the meaning of section 170(c) in 1979. We must point out at the outset that valuation issues are normally far better suited to settlement than to disposition by the Court, as any valuation is "inherently imprecise and capable of resolution only by a Solomon-like pronouncement." See Buffalo Tool & Die Mfg. Co. v. Commissioner,74 T.C. 441, 452 (1980); Messing v. Commissioner,48 T.C. 502, 512 (1967). Although the parties may anticipate that the Court will divide the difference between the valuations of the parties, there can be no assurance *36 that the Court will not find the evidence of one of the parties ultimately persuasive. Buffalo Tool & Die Mfg. Co. v. Commissioner,supra at 452. Fair market value has been defined for our purposes as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts." Sec. 1.170A-1(c)(2), Income Tax Regs. The prices at which similar property changed hands at or near the point in time of the selected valuation date provide perhaps the best evidence of fair market value. Wolfsen Land & Cattle Co. v. Commissioner,72 T.C. 1, 19 (1979); Estate of Nail v. Commissioner,59 T.C. 187, 193 (1972); A.G. & S. Mining Co. v. Commissioner,8 B.T.A. 1260, 1262 (1927). We cannot agree with the valuation placed on the Section 16 lease by petitioners because, on the whole, we find that the sales selected by their experts as comparables were not sufficiently similar to Section 16 to be probative of a value of $2,540,000 for the Section 16 lease. Necessarily important to the value of a coal *37 lease is the presence of coal in sufficient quantities to sustain a mining operation. In the absence of a surface outcrop, the presence of coal beneath the surface of Section 16 would be determined most accurately by test wells drilled within its boundaries. Information culled from surface outcrops located approximately 4-1/2 miles from Section 16's borders and test wells located approximately 1 to 1-1/2 miles away allows, at best, the projection of coal reserves beneath Section 16 with a high degree of reliability. The possibility remains, however, that Section 16 does not contain substantial reserves of coal. The value of the Section 16 lease would be enhanced if those reserves were confirmed by test wells drilled on Section 16. Furthermore, the value of a coal lease is not predicated merely on the probable presence of large reserves; the coal must be capable of extraction with present mining techniques. The coal beds must not be under so much rock overburden so as to render them unmineable with present technology. Even if the coal reserves are plentiful and they can be mined with currently available techniques, the coal must be capable of economical extraction. A large amount *38 of overburden can render a coal reserve prohibitively expensive to mine because of the great costs of gaining access to the coal beds. For this reason a tract containing a surface outcrop of coal is more valuable than a tract with only subsurface coal because th coal can be reached and brought to the surface much less expensively. Similarly, a tract with deep subsurface coal beds, but immediately adjacent to a tract that has already been mined, is more valuable than an isolated tract with equal reserves under equal overburden. Petitioners have presented some evidence of the circumstances surrounding certain ostensibly comparable sales. While the sales prices for these "comparable" sales provide a facial justification for the value petitioners claim for Section 16, we do not find the background information provided for these sales sufficient to demonstrate that the subject tracts were truly comparable to Section 16 and, therefore, probative of the fair market value of Section 16. Hunt v. Commissioner,12 B.T.A. 396, 399 (1928); Seneca Coal Mining Co. v. Commissioner,2 B.T.A. 513 (1925). Olsen, one of petitioners' experts, relied extensively *39 on the AEP purchase of the Braztah lease in 1974 for $ .18 per recoverable ton, or approximately $ .09 per ton in place, to value the reserves underlying Section 16 in 1979 at $ .10 per ton. Although the Braztah lease does not contain a surface outcrop, its value is greatly enhanced by its location immediately adjacent to the existing mining face of the AEP mine. If AEP chose to re-enter this mine and renew production, the acquisition of the Braztah tracts would be essential. Stratigraphic data indicates that the logical course of continued drift mining would be under the Braztah tracts because the coal beds would be more plentiful and consistent if followed down dip to the North. In contrast, Section 16 is an isolated tract that would either require that mining thereon await the depletion of all reserves between Section 16 and the AEP mine by the drift method or require great expenditures do big a vertical shaft. Petitioners also consider the BLM sale of the Rilda Canyon tract for $ .71 per recoverable ton or approximately $ .35 per ton in place supportive of a value of $ .10 per ton in place for the Section 16 reserves. However, Olsen noted that the bid for the Rilda Canyon *40 tract was higher than expected "because of the property's strategic position." Petitioners also argue that the North Horn Mountain and the Sunedco purchases represent comparable sales demonstrative of the value of Section 16. The North Horn Mountain cannot be considered a comparable sale because no sale occurred; the Federal government put the property up for sale at $ .35 per ton, but no bids were received. The Sunedco purchase for $1.42 per recoverable ton (roughly $ .71 per ton in place) is, likewise, not a satisfactory comparable because the reserves, the extent of which was not revealed at trial, were accessible by a surface outcrop within the tract's boundaries and reserves had been further confirmed by test wells. Petitioners also provided a list of several other supposedly comparative sales from 1974 through 1983 at prices varying from $ .017 to $1.06 per ton. We find these sales of limited probative value because it is unknown whether these sales were of tracts containing surface outcrops, reserves confirmed by test wells, and little overburden, or whether they were isolated tracts under significant overburden sold merely for their speculative value. We could have more *41 easily inferred the fair market value of the Section 16 lease had we been presented with more information concerning these comparable sales such as: the location of the comparable tracts, the existence of surface outcrops thereon, the depth of overburden, the projected amounts of reserves, whether the sales were in fee or of leases, and, if leases, the lengths of term and the royalty obligations. Without more information, we cannot make a meaningful comparison. The evidence of comparable sales presented by petitioners provides some indication of the fair market value of Section 16. Nevertheless, because many of the sales were of tracts with very different characteristics than Section 16 and because we do not have sufficient information about the other sales to make a reasonable comparison, we find petitioners have not met their burden of proving a value of $2,540,000 for the Section 16 lease. Rule 142(a), Tax Court Rules of Practice and Procedure.
Although we do not concur in the valuation presented by petitioners, we also cannot accept the zero value determined by the Commissioner in his statutory notice of deficiency. Respondent's expert did not rely on comparable sales to *42 value the reserves underlying Section 16. Although the comparable sales method is widely recognized as perhaps the best approach to determine fair market value, its use is not mandatory. Nevertheless, we find that the methodology used by respondent's expert was unsatisfactory. Respondent's expert, Cohenour, began his valuation by calculating, in a very convincing manner, the probable existence of approximately 28 million tons of coal underlying Section 16. Cohenour then discounted the estimated coal in place to account for the possibility that the projection of coal reserves based on data points located outside Section 16 was inaccurate. Although the presence and amount of coal underneath Section 16, in the absence of confirmation, can be thought of the terms of probabilities, Cohenour's selection of a 60-percent discount figure appears arbitrary.Cohenour then discounted the reserves further to arrive at a figure for estimated recoverable coal reserves. Cohenour selected a recovery percentage of 50 percent even though the local experience was that recoveries were between 70 and 80 percent. Cohenour then multiplied estimated recoverable reserves of 8,570,880 by $ .10 per recoverable *43 ton for a total value of $857,088. Cohenour's value of $ .10 per recoverable ton was not based upon comparable sales or upon a calculation of the costs of mining, but was merely the figure that he had used for such purposes since the 1960's. Cohenour also relied to some extent on the $ .10 per ton value found by petitioners. Cohenour's reliance appears to have been misplaced because his value was $ .10 per recoverable ton and petitioners' experts found a value of $ .10 per ton in place. Assuming a recovery factor of 70 percent, a value of $ .10 per ton in place would translate into approximately $ .14 per recoverable ton. Respondent argues, and we agree, that the value of a lease to extract minerals for a period of time is not necessarily equal to the value of the minerals in the ground. Even if we assume that 25 million tons of high quality coal underlie Section 16, we must also consider whether the coal would be mined within the lease term, given the practical and economic constraints that existed in 1979. The evidence before us indicates that the value of the Section 16 lease was $50,000 based on the purchase of the lease by the partnership in 1977. We find *44 superfluous respondent's expert's recommendation of $10,000 as the value of an option to lease Section 16, an option being very different than the actual lease transaction. In finding a fair market value of $50,000 for the lease contributed to BYU, we have considered all of the evidence presented by the parties. We reject the value placed on the reserves by the parties' experts because the evidence of sales selected by them as comparables was not accompanied by sufficient information to determine whether the sales were actually comparable. Instead, we have considered the "comparative" sale most probative of the Section 16 lease in 1979: the purchase of the Section 16 lease by the partnership in 1977. Tripp v. Commissioner,337 F.2d 432, 434 (7th Cir. 1964), affg. a Memorandum Opinion of this Court; Douglas Hotel Co. v. Commissioner,14 T.C. 1136, 1141 (1950), affd. 190 F.2d 766 (8th Cir. 1951). The purchase of the Section 16 lease has the virtue of relating to the identical property we are attempting to value in 1979. General conditions had not altered the value of Section 16 during the 2-year period between the purchase and the *45 charitable contribution. No test wells were drilled to confirm the reserves under Section 16 nor did mining advance from the AEP mines closer to the borders of Section 16. The occurrence of either event could have enhanced the value of the Section 16 lease. We find the 1977 arm's-length purchase of the Section 16 lease by the partnership much more probative of the value of the lease than the 1975 purchase by AEP of the Braztah lease, which covered tracts of a significantly different character than Section 16. We find the information about other sales provided by petitioners so incomplete that we cannot draw any meaningful inferences of the value of the Section 16 lease from those sales. We have considered the possible increase in value of the Section 16 lease due to inflation. We find, however, that any increase in value is offset by the fact that the lease term had 2 years less to run. The 10-year lease term had 7 years remaining when the partnership acquired it and only 5 years when the lease was contributed to BYU. Given the circumstances, mining of Section 16 by the drift method could not begin until the AEP mine face reached Section 16, which might never occur. Economic *46 conditions also do not indicate that a vertical shaft reaching the reserves of Section 16 could be justified in 1979. Unless conditions changed, actual mining of Section 16, thereby extending the lease term indefinitely, could not commence until after the lease term expired. This being true, the lease of Section 16 had only speculative value in 1979 most accurately demonstrated by the price the Section 16 Coal Partnership was willing to pay in 1977. The remaining issue for decision is whether petitioners are liable for the addition to tax for negligence for their taxable years 1979 and 1980. To avoid the addition to tax under section 6653(a), [9] petitioners must show that no part of any underpayment of income taxes was due to their negligence or intentional disregard of rules and regulations in preparing their tax returns. Marcello v. Commissioner,380 F.2d 499, 505-507 (5th Cir. 1967). *47 Respondent maintains that petitioners' claim of charitable deductions far in excess of the fair market value we have determined for the coal lease necessarily constitutes negligence. We do not agree. Petitioners obtained the opinion of qualified experts concerning the value of the Section 16 coal lease prior to claiming the charitable deductions. There being no indication that petitioners' reliance on their advisors was not in good faith, we find petitioners were not negligent, and we decline to impose the addition to tax under section 6653(a). Decisions will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code for the taxable years in issue.↩
2. Joann J. Butler is named as a party to this action solely because she filed joint Federal income tax returns with her husband for the years in issue. For this reason, Butler will be used hereinafter to refer to petitioner Marvin J. Butler.↩
3. Lawana Timothy is named as a party to this action solely because she filed joint Federal income tax returns with her husband for the years in issue. For this reason, Timothy will be used hereinafter to refer to petitioner James A. Timothy.↩
4. Other members of the Section 16 Coal Partnership, who are not parties to this action, have stipulated to be bound by our determination of the fair market value of the donated lease. Some of these other partners claimed a value for their 10-percent interests in the Section 16 lease of less than $254,000. This discrepancy will have no effect on the disposition of the valuation issue as to all partners who have stipulated to be so bound. See Dockets 32889-83 and 32890-83.↩
5. This coal bed is also known as the Kenilworth, but for clarity we will refer to it only as the Castlegate "D."↩
6. Dip is defined as an "inclination downward" and as "the angle that a stratum or similar geological feature makes with a horizontal plane." Webster's Ninth New Collegiate Dictionary (1985).↩
7. "Recoverable" refers to the portion of in-ground reserves that can be brought to the surface. The percentage of recoverable coal is always less than total reserves due to the limitations of the mining technique used and the depth of overburden. See U.S. Geological Survey, Circ. 891, Coal Resource Classification System of the U.S. Geological Survey 18 (1983).↩
8. U.S. Geological Survey, Circ. 891 supra↩ at 29.
9. SEC. 6653. FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard of Rules and Regulations With Respect to Income, Gift, or Windfall Profit Taxes.--If any part of any underpayment * * * of any tax imposed by subtitle A, by chapter 12 of subtitle B (relating to income taxes and gift taxes), or by chapter 45 (relating to windfall profit tax) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.↩